CV 13 0370

Original

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------X

FRANK FORZIANO and ROSEANN FORZIANO as
Parents and Article 17A Co-Guardians of PAUL FORZIANO,
NORMAN SAMUELS and BONNIE SAMUELS as
Parents and Article 17A Co-Guardians of HAVA SAMUELS,
PAUL FORZIANO, and HAVA SAMUELS,

Plaintiffs,

-against-

INDEPENDENT GROUP HOME LIVING PROGRAM, INC.,
MARYHAVEN CENTER OF HOPE, INC., and COURTNEY
BURKE, Sued Herein in her Official Capacity as the
COMMISSIONER OF THE NEW YORK STATE
OFFICE OF PERSONS WITH DEVELOPMENTAL
DISABILITIES, and STATE OF NEW YORK

Defendants.

-------------------------------------------------------------------------------X,

**COMPLAINT**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★ ⬛ 2 2 2013 ★

LONG ISLAND OFFICE

13 Civ-_____

WEXLER, J.

BOYLE, M

## STATEMENT OF PLAINTIFFS' CLAIMS

1. Plaintiffs file this action complaining of defendants for violations of the Americans with
   Disabilities Act, 42 U.S.C. Section 12131 et seq. and 42 U.S.C. Section 12204 et seq.
   ("ADA"), the Fair Housing Act, 42 U.S.C. 3601 et seq., the equal protection and due process
   clauses of the 14th Amendment to the United States Constitution, Federal Medicaid Law, 42
   U.S.C. § 1396a(a)(10)(B), the New York State Executive Law § 296, and the New York
   State Mental Hygiene Law ("MHL"). Plaintiffs seek declaratory and injunctive relief,
   compensatory damages as well as attorney's fees and costs against the defendants.

## PARTIES

2. Plaintiff PAUL FORZIANO is an adult born on April 12, 1983, with a developmental
   intellectual disability. He resides in Suffolk County, New York, in a group home owned and
   operated by defendant INDEPENDENT GROUP HOME LIVING PROGRAM, INC.,

1

("IGHL"), and funded by THE NEW YORK STATE OFFICE OF PERSONS WITH DEVELOPMENTAL DISABILITIES ("OPWDD").

3. Plaintiff HAVA SAMUELS is an adult born on May 4, 1977, with a developmental intellectual disability. She resides in Suffolk County, New York, in a group home owned and operated by defendant MARYHAVEN CENTER OF HOPE, INC., ("MARYHAVEN"), and funded by defendant OPWDD.

4. Plaintiffs FRANK FORZIANO and ROSEANN FORZIANO ("FORZIANOS"), as parents and guardians of the person of PAUL FORZIANO, are residents of the hamlet of Rocky Point Suffolk County, New York and reside in Rocky Point.

5. Plaintiffs NORMAN SAMUELS and BONNIE SAMUELS ("SAMUELS"), as parents and guardians of the person of HAVA SAMUELS, are residents of the hamlet of Port Jefferson Station in Suffolk County, New York.

6. Defendant IGHL is an active domestic not-for-profit corporation existing under and by virtue of the laws of the State of New York. IGHL is incorporated in Suffolk County, New York.

7. Defendant MARYHAVEN is an active domestic not-for-profit corporation existing under and by virtue of the laws of the State of New York. MARYHAVEN is incorporated in Suffolk County, New York.

8. Defendant COURTNEY BURKE is the Commissioner of OPWDD, an agency of New York State. Commissioner Burke is sued herein in her capacity as Commissioner of OPWDD.

9. Defendant STATE OF NEW YORK created OPWDD as an agency of the state. All official actions of OPWDD constitute actions of the State of New York.

## VENUE AND JURISDICTION

10. This Court has jurisdiction pursuant to 28 U.S.C. Sections 1331 and 2201 and through the ADA.

11. This Court has venue through the activities of the defendants in Suffolk County, New York.

## ALLEGATIONS OF FACT AND STATEMENTS OF LAW
## COMMON TO ALL CLAIMS

12. Plaintiff Paul Forziano has been classified since childhood as being in the mild to moderate range of intellectual functioning. Paul has an intellectual disability that significantly limits his cognitive functioning.[1] Paul is very affable, verbal and independent in his ability to dress, groom, perform household chores, and socialize with other people in an appropriate manner. He keeps track of dates and appointments and takes his own medications. He has a large circle of friends and family and is very family oriented. He enjoys using a computer for browsing, and is independent in use of the telephone. He has limited reading and writing skills and cannot manage money. He is trusting of others and is vulnerable to being taken advantage of by others. He has limited ability to make judgments in matters of personal emergency or safety, or in higher level functioning. He had Full Scale IQ scores of 50 and 58 on recent psychological examinations.

13. As a result of his intellectual disabilities, Paul is eligible for and receives services funded by defendant OPWDD and provided through defendants IGHL and MARYHAVEN, including

---

[1] Intellectual Disability is a term that is synonymous with the term Mental Retardation. ID is used in this Complaint out of deference to the plaintiffs because of derogatory connotations associated with the term Mental Retardation. Reference to "Mental Retardation" was removed from the Mental Hygiene Law statute that names OPWDD in 2011. The former agency name was Office of Mental Retardation and Developmental Disability.

supervised Individualized Residential Alternatives ("IRA") provided by defendant IGHL and Day Habilitation Services provided by defendant MARYHAVEN.[2]

14. The IRA services Paul receives are provided pursuant to Sections 13.01, 13.07, 16.03, 16.05, and 16.13 of the MHL. See also, Social Security Act § 1915, 42 U.S.C. § 1396n, quoted in 14 NYCRR § 671.99(a).

15. Paul is a qualified individual with a disability as that term is defined in 28 C.F.R. § 35.104, in that he receives supervised IRA and day habilitation services from defendant OPWDD through defendants IGHL and the Maryhaven Center of Hope Performing Arts Day Habilitation Program ("Maryhaven Day Program").

16. Plaintiff Hava Samuels has been classified since childhood as being in the moderate range of intellectual functioning. Hava has an intellectual disability that significantly limits her cognitive functioning. Hava is friendly and verbal, but has a significant expressive language disability which can make it difficult sometimes for others to understand her or to fully realize the content of her thought processes. She is independent in her ability to dress, groom, and matters related to her own personal care. She makes her own bed and cleans her own room. She also performs common area household chores. She understands that she needs money to purchase goods and services but is not able to count money. She has sight vocabulary reading skills. She is learning to take her own medications. She uses a telephone with pictures for automatic dialing. She is very social and relates to others in an appropriate manner. Hava has a large circle of friends and family and is very family oriented. She is vulnerable to being taken advantage of by others. She has limited ability to make judgments in matters of personal emergency or safety, or in higher level functioning. She had Full Scale

---

[2] The term "supervised IRA" is also used interchangeably in this complaint with "group home."

IQ scores of 50 and 44 on psychological examinations in 2000 and 2011. One of the test administrators indicated that her expressive language disability affected the test results and as a result the test results should be considered a minimal estimate of her level of intellectual functioning.

17. As a result of her intellectual disabilities, Hava is eligible for and receives services funded by defendant OPWDD and provided through defendant MARYHAVEN, including supervised IRA services provided by defendant MARYHAVEN and day habilitation services provided by the Maryhaven Day Program.

18. The IRA services Hava receives are provided pursuant to Sections 13.01, 13.07, 16.03, 16.05, and 16.13 of the MHL. See also, Social Security Act § 1915, 42 U.S.C. § 1396n, quoted in 14 NYCRR § 671.99(a).

19. Hava is a qualified individual with a disability as that term is defined in 28 C.F.R. § 35.104, in that she receives IRA and day habilitation services from defendant OPWDD through defendant MARYHAVEN.

20. The State of New York has a responsibility for "... the comprehensively planned provision of services including care, treatment, habilitation and rehabilitation of their citizens with developmental disabilities." MHL § 13.01. OPWDD was created to meet that responsibility.

21. OPWDD must assure that its funded services "are of high quality and effectiveness, and that the personal and civil rights of persons receiving such services are protected. The services provided shall seek to promote and attain independence, inclusion, individuality and productivity for persons with developmental disabilities." MHL § 13.07(c).

22. OPWDD must ensure that there are uniform standards for the provision of comparable services by providers throughout the state. MHL 16.01(b).

23. OPWDD's services are administered through regional offices. Services in Long Island are administered through the Long Island Developmental Disabilities Services Office. ("LIDDSO").

24. The Acting Director of the LIDDSO is Robert Lopez.

25. Regional OPWDD Directors must oversee the administration of OPWDD funded services that are provided through facilities operated by IGHL, MARYHAVEN and other private corporations or organizations. MHL § 13.21(a) and (d).

26. All facilities in which OPWDD funded services are provided that are operated by entities other than the state must obtain an operating certificate from OPWDD. MHL § 16.03(a). Such facilities must be operated in accordance with the operating certificate and OPWDD regulations. MHL § 16.03(d).

27. Operating certificates must be renewed every three years. MHL § 16.05(f). OPWDD can refuse to renew operating certificates if a provider fails to comply with applicable laws and regulations. MHL § 16.05(d).

28. Defendant IGHL holds an operating certificate issued by OPWDD for the group home in which plaintiff Paul Forziano lives.

29. Defendant MARYHAVEN holds an operating certificate issued by OPWDD for the group home in which plaintiff Hava Samuels lives.

30. IGHL and MARYHAVEN, as holders of OPWDD operating certificates, must assist OPWDD and LIDDSO in carrying out their regulatory and oversight functions by complying with all applicable provisions of the New York State Hygiene Law, OPWDD regulations and other applicable laws. MHL § 16.13(a).

31. IGHL and MARYHAVEN are subject to injunctive powers of the State for violations or threatened violations of the Hygiene Law and OPWDD regulations. MHL § 16.21(a).

32. Among the Mental Hygiene Laws that defendants must comply with is the obligation to ensure that:

> "...no person shall be deprived of any civil right, if in all other respects qualified and eligible, solely by reason of receipt of services for a mental disability nor shall the receipt of such services modify or vary any civil right of any such person, including but not limited to civil service ranking and appointment, the right to register for and to vote at elections, or rights relating to the granting, forfeiture, or denial of a license, permit, privilege or benefit pursuant to any law." MHL § 33.01.

### FOR A FIRST CAUSE OF ACTION UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT AGAINST OPWDD

### Defendant OPWDD's Obligations Under Title II of the ADA

33. Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

34. Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, applies to public entities, including the states and territories of the United States.

35. Title II of the ADA provides that "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

36. Implementing regulations for Title II of the ADA are set forth in 28 C.F.R. Part 35. Among these regulations are the following applicable anti-discrimination provisions:

> a. "A public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability—...(v) Aid or perpetuate discrimination against a qualified individual with a disability by providing significant assistance to an agency, organization, or person that discriminates on the basis of disability in providing any aid, benefit, or service to beneficiaries of the

7

public entity's program ... (vii) Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28 C.F.R. §§35.130(b)(1)(v) and (vii).

b. "A public entity may not .... utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities..." 28 C.F.R. §§35.130(b)(3)(i) and (ii).

c. "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. §35.130(b)(7).

d. "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. §35.130(d).

## OPWDD Policy and Practice to Encourage Persons with DD/ID to Marry if Capable

37. A fundamental civil right of all persons, including persons with mental disabilities, is the right to marry.

38. Attendant and fundamental to marriage is the ability to cohabit.

39. The right to marry and to cohabit in OPWDD supervised IRA residences is implicit in OPWDD regulations and policy guidance documents. 14 NYCRR § 27.6(a)(2); "*A Handbook for All OMRDD Providers Part 624*, Revised 10/27/11, Appendix 3, Considerations for Consent to Sexual Contact, p. 285."[3]

40. Upon information and belief, OPWDD and LIDDSO fund and oversee married persons and couples with long-term relationships residing in supervised IRA housing.

---

[3] The Handbook is available on OPWDD's website, under the web page for "Regulations and Guidance" in subpage "Guidance Documents. The Handbook can be found under the subject title "Incident Management."

41. United Cerebral Palsy of Suffolk ("UCP") operates OPWDD certified supervised IRA homes in Suffolk County, New York. In one of UCP's supervised IRA homes a married couple has resided together for over fourteen years.

42. Mr. Lopez has personally known of the couple referred to in the preceding paragraph for a number of years prior to his personal involvement with the plaintiffs desire to marry and live in a supervised IRA.

43. On October 19, 2012 Mr. Lopez spoke at a legislative breakfast sponsored by OPWDD/LIDDSO. This meeting was also attended by the FORZIANOS and the SAMUELS. At this breakfast meeting the husband of a couple referred to in the preceding paragraph spoke about his life in a supervised IRA group home. His introduction was offered as an example of successful implementation of OPWDD's policy expressed in its Mission Statement to assist the persons it supports to have meaningful relationships with others in a home of their choice, and to support them in their desires to achieve the personal goals they choose for themselves.

44. After the formal part of the meeting Mr. Lopez told Mrs. Forziano and Mrs. Samuels that he has personally known the couple for a long time prior to his personal involvement with the plaintiffs desire to marry and cohabit in a supervised IRA. Mr. Lopez made note of the couple as an example of the personal achievements that OPWDD/LIDDSO encourages in its habilitation programs.

45. Walter Stockton, CEO of IGHL and Thomas Trakoval, IGHL's Director of Program Services, attended this same legislative breakfast, as well as another OPWDD/LIDDSO event on October 24, 2012 at LIDDSO's offices which discussed Willowbrook and similar institutions. The husband of the married couple living in the UCP supervised IRA was a

9

featured speaker at the second OPWDD event. Once again, his marriage and cohabitation in a a supervised IRA was offered as an example of successful implementation of OPWDD's policy expressed in its Mission Statement to assist the persons it supports to have meaningful relationships with others in a home of their choice, and to support them in their desires to achieve the personal goals they choose for themselves.

46. Many years ago UCP housed another married couple in one of its supervised IRA homes. That same couple formerly lived in an Intermediate Care Facility ("ICF") funded by OPWDD (formerly known as the Office of Mental Retardation and Developmental Disabilities) which was later taken over by UCP. While living in the ICF as a married couple, the ICF managers would not permit the couple to sleep together in the same room. The husband and wife lived in separate rooms in the same facility. An auditor employed by OMRDD discovered this fact and initiated an investigation of the ICF operator. As a result of the investigation, the ICF operator was declared to be in violation of the Mental Hygiene Law and required to permit the couple to sleep together in the same room. Thereafter, UCP assumed operation of the ICF, reformed it into a supervised IRA, and operated it with the married couple sharing the same room.[4]

47. In addition to the married couple that resides in the UCP supervised IRA, at least one other married couple resides in one of the YAI Network's supervised IRA homes in New York.

**History of Paul and Hava's Desire to Be Married**

48. Paul Forziano and Hava Samuels met in the summer of 2004 through the Maryhaven Day Program. Paul had just turned 21 and finished his public school education. He was living at home with his parents and had just started attending the Maryhaven Day Program. Hava had

---

[4] The wife of the couple has since passed away. The husband is now living in a nursing home.

been attending the Maryhaven Day Program since it began in 2002. She has resided in a MARYHAVEN supervised IRA group home since 2000.

49. Paul and Hava started talking to their parents about each other approximately seven years ago. Their interest in each other grew to the point where Hava asked Paul to be her date at a semi-formal dinner sponsored by her bicycle club. Around this time Paul and Hava began introducing themselves to their parents and people at the Day Program as each other's boyfriend and girlfriend.

50. Paul and Hava agree that their anniversary is September 1, 2006.

51. In 2009, Paul moved out of his parents' home into an IGHL supervised IRA group home. Paul continued to attend the Maryhaven Day Program with Hava. During Paul's first year at IGHL he had a difficult transition. Hava provided him with essential support in that first year.

52. The parents supported the growing relationship between Paul and Hava. The relationship has grown gradually to the point where Paul and Hava meet almost every weekend at the homes of their parents, in addition to spending time at the Maryhaven Day Program. Paul and Hava speak to each other frequently by phone. Together they watch movies and TV, bowl and attend each other's family events. Paul joined Hava's bicycle club in 2010. Paul and Hava participate in club events. The two families get along very well and function as an extended family.

53. Paul goes on short weekend vacations with Hava and her parents to visit family in Virginia. Paul's parents regularly take Hava to local events here on Long Island.

54. Three to four years ago Paul and Hava started telling their parents that they loved each other. Since that time Paul and Hava continue to proclaim their love for each other to their parents

and others. They are devoted to each other and dote on each other as do other couples in love. They spend hours together each day on weekends and do not want to separate when they have to return to their respective group homes. Their love has endured for a number of years and their commitment to each other is forever.

55. In the spring of 2010, Paul and Hava announced to their parents that they want to be married. Both Paul and Hava understand that marriage is a commitment that should last forever.

56. Paul and Hava share a love story that both want to continue through the sacrament and legal commitment of marriage. They observed very strong marriage bonds between their respective parents. They have also experienced throughout their lives the love and happiness that being part of their families has brought to them. The marriage bonds of their parents and Hava's married sibling, and the love they have as a family, inspired Paul and Hava's desire to marry. They want for themselves what their parents and Hava's sibling have. They perceive that being married is a fundamental part of the familial relationship that has brought joy to their lives.

57. Paul and Hava understand that they need to live in supervised housing. Both agree that they will not have children. They understand that their limitations would make it too difficult to bear the great responsibilities that parents must bear.

58. The parents carefully and thoughtfully discussed Paul and Hava's desire to be married with their children and with each other. Following these discussions, the parents concluded that Paul and Hava's desire to be married was genuine, abiding and would be beneficial to their happiness and personal fulfillment.

59. In reaching the conclusion to support Paul and Hava's desire to marry, the parents gave great weight to the enduring and genuine nature of the love that Paul and Hava demonstrate. They

also gave great weight to the companionship that Paul and Hava will give to each other when the parents pass away. They weighed this hope against the loneliness that Hava and Paul could experience if they did not have each other.

60. Commencing in the first months of 2010, the Forzianos and the Samuels began to research marriage by couples with intellectual developmental disabilities. They tried to find out if it was legal and how it could be done. Their research showed that there was no legal barrier to marriage by persons with intellectual disabilities. They then began thinking about the practical issues related to marriage, including where they would live together.

61. In mid-April of 2010 IGHL sponsored a legislative field trip to Albany by the residents of Paul's group home and IGHL employees. The purpose of the trip was to encourage clients to advocate for their personal needs with legislators who may help improve their lives within the OPWDD system.[5] Paul was selected to speak with New York State Senator Kenneth P. LaValle, who represents Middle and Eastern Suffolk County residents. At the meeting with Senator LaValle, Paul chose to tell Senator LaValle that he wants to marry Hava and live together with her.

62. Within a week, Senator LaValle's administrative assistant called Paul's parents and spoke to them about Paul and Hava's desire to be married. The assistant relayed Senator LaValle's encouragement to Paul and Hava in their desire to be married and offered the assistance of his office to help them reach their goals. Shortly after that Senator LaValle's office followed up its phone call and told the Forzianos that the Senator would contact OPWDD to discuss the matter with them. Senator LaValle's office then contacted Mr. Lopez from LIDDSO to discuss Paul and Hava's needs in marriage and housing.

---

[5] Paul's advocacy before members of New York State's legislature is an example of a policy and practice by OPWDD and its private service providers called "Self-Advocacy."

63. On April 30, 2010 Mr. Lopez called Paul Forziano's parents and offered them his assistance through a meeting with IGHL and MARYHAVEN officers and employees in an attempt to facilitate a solution. Mr. Lopez told the Forzianos to expect a call from Mr. Trakoval of IGHL. He expressed his belief that Mr. Trakoval would think outside the box for a creative solution to their desire to marry and live together.

64. Mr. Lopez did not indicate that he would direct IGHL and/or MARYHAVEN to comply with the MHL, OPWDD regulation and policy, which requires an accommodation to assist Paul and Hava to achieve their own goals for personal relationships with others in housing of their choice.

65. Mr. Trakoval did not call the Forzianos. Instead, on May 11, 2010 Roseann Forziano received a call from Mary Herrick, a psychologist with IGHL, and Barbara Carey-Shaw, Ph.D., IGHL's Clinical Director, who is also a psychologist. Ms. Herrick acknowledged the call from Mr. Lopez and his conversation with Senator LaValle. She did not offer any solutions or any specific information.

66. Roseann Forziano stated that she and her husband would ask IGHL at the meeting to provide housing for Paul and Hava when they get married. Both Ms. Herrick and Dr. Carey-Shaw responded as though they were taken aback that the Forzianos would expect IGHL to provide married housing for Paul and Hava. Dr. Carey-Shaw commented that she was "being put in the middle again."

67. Dr. Carey-Shaw held a negative opinion of Paul and Hava's desire to marry and cohabit.

68. On May 20, 2010 Bonnie Gumiela, a counselor with the Cody Center, received a phone call from Dr. Carey-Shaw about the plans of Paul and Hava to get married. The Cody Center is a Suffolk County program associated with Stony Brook Hospital that specializes in addressing

the needs of individuals with developmental disabilities. Paul and Hava had attended relationship counseling with Ms. Gumiela to assess their relationship and assist them in strengthening their relationship.

69. Based upon her relationship counseling with Paul and Hava, Bonnie Gumiela opined to Dr. Carey-Shaw that Paul and Hava's desire to marry was appropriate.

70. In the phone conversation with Ms. Gumiela, Dr. Carey-Shaw made it clear that she and IGHL did not believe that Paul and Hava were capable of marrying and cohabiting. When asked why she held that belief, Dr. Carey-Shaw replied that if a person cannot wash, cook, iron and take care of money for themselves then that person cannot take care of another person.

71. Upon information and belief, Dr. Carey-Shaw's comments to Ms. Gumiela established a standard for Paul and Hava's ability to marry that is factually and legally erroneous and contrary to the Mental Hygiene Law and Paul and Hava's civil rights.

72. The meeting to discuss accommodating Paul and Hava's desire to marry and cohabit in one of their respective group homes was delayed by defendants until August 24, 2010.

73. Approximately one week before the August 24, 2010 meeting, the Forzianos met with Mr. Stockton and Mr. Trakoval of IGHL about an unrelated matter. During the course of that meeting, Mr. Trakoval brought up the upcoming meeting with Mr. Lopez. Mr.Trakoval went on to say that providing housing to a married couple was not something IGHL had ever done and not something it would be interested in doing. The Forzianos brought up the possibility of Paul and Hava living at Hava's MARYHAVEN group home. Mr. Trakoval then said, if the Forzianos had any "pie in the sky ideas" that MARYHAVEN would provide housing as a married couple for Paul and Hava they would be wrong. Mr. Stockton then acknowledged

reading a June 8, 2010 letter from Ms. Gumiela supporting Paul and Hava's desire to be married, and commented that the letter was "sophomoric and sad."

74. Despite IGHL's obvious opposition and refusal to accommodate Paul and Hava's desire to marry and cohabit in Paul's group home, the Forzianos stated that they wanted to go ahead with the August 24, 2010 meeting.

75. The August 24, 2010 meeting was attended by Mr. Lopez, Paul and Hava's parents, the Medicaid Service Coordinators for Paul and Hava, and several IGHL and MARYHAVEN administrators and employees, including Mr. Trakoval and Dr. Carey-Shaw for IGHL and Robin Dwyer, Executive Division Director for Residential and Educational Services, and Chuck Vanek, Assistant Division Director for Residential Services, for MARYHAVEN.

76. Mr. Trakoval and Ms. Dwyer explicitly announced their opposition to housing Paul and Hava in either the IGHL or MARYHAVEN supervised IRA homes that Paul and Hava live in. Their explanation of their position indicated that IGHL and MARYHAVEN categorically excluded married couples from eligibility for supervised IRA housing.

77. Mr. Lopez did not express outright opposition to housing Paul and Hava in a supervised IRA as a married couple. He did state that he was not personally aware of any OPWDD/LIDDSO clients who were married and lived in a supervised IRA. Mr. Lopez went on to state that the issue of Paul and Hava's capacity to consent to sexual activity was paramount, and that current and methodologically appropriate sexual consent assessments should be performed for both, together with proper education related to their capacity to consent.

78. Upon information and belief, OPWDD policy does not require capacity to consent to sexual contact as a condition precedent to marriage among persons with developmental disabilities. Rather, it requires a more comprehensive and nuanced evaluation of the two adults' abilities

16

to engage in a *marital* relationship. Some married adults have intimate mutually beneficial marriages without sex.

79. Mr. Lopez also indicated that encouraging a sexually consenting couple's desire to marry and cohabit were part of OPWDD/LIDDSO duties, and the duties of the agencies such as IGHL and MARYHAVEN. Mr. Lopez stated that exploration of the steps that were necessary to determine a consenting couple's ability to marry and cohabit should be addressed through the obligation of the agencies to prepare semi-annual and annual Individualized Service Plans ("ISP") for each resident. The obligation to prepare an ISP is set forth in MHL § 33.02(11).

80. Despite having the legal responsibility to provide Paul and Hava with appropriate instruction in sexual education and sexual capacity evaluations, and despite knowing that Paul and Hava want to marry and cohabit in one of their respective group homes, neither IGHL nor MARYHAVEN included such instruction and evaluations in Paul and Hava's ISP's.

81. Defendants' focus at the August 24, 2010 meeting regarding plaintiffs' requests for a reasonable accommodation that would permit Paul and Hava to reside as a married couple in one of the respective group homes was entirely upon Paul and Hava's capacity to consent to sexual contact. Defendants ignored the fact that Paul and Hava fell in love and determined they want to be married without sexual activity as a part of their relationship. In effect, defendants stated to the plaintiffs that Paul and Hava's capacity to consent to sexual contact was a condition precedent to their civil right desire to be married and cohabit in OPWDD IRA housing.

82. No defendant informed the plaintiffs at any time before, during, or after the August 24, 2010 meeting that if Paul and Hava were married, OPWDD policy, since July 30, 1993, deemed

them capable of consent to sexual activity and made the requirement of a sexual consent assessment unnecessary:

"**The principles expressed in these guidelines generally apply to persons who are married as well as to those who are not married. For persons who are married, there is the assumption that they have the ability to consent to sexual contact and, therefore, the section entitled "SEXUAL CONTACT" would not generally apply.**" OMRDD Part 624 Handbook, Revised 10/27/11, Appendix 3, page 285.

83. At the August 24, 2010 meeting Dr. Carey-Shaw offered her services to perform a sexuality consent assessment of Paul Forziano. Dr. Carey-Shaw indicated that parents and staff would be solicited for their knowledge of Paul and Hava's relationship to complement such an assessment.

84. Despite the Forzianos' belief that Dr. Carey-Shaw was plainly biased against Paul and Hava residing as a married couple in Paul's group home, they agreed to her offer to assess Paul because they had no other options at that time to facilitate Paul and Hava's marriage plans.

85. Shortly after August 24, 2010 meeting, the Forzianos contacted Dr. Carey-Shaw to set up an assessment and to obtain guidance on how Paul could be educated in the matters he would need to know for the assessment.

86. Dr. Carey-Shaw never provided Paul with education related to the sexual capacity assessment and delayed performance of his assessment until May 24, 2011.

87. Dr. Carey-Shaw used a version of the SSKAAT-R sexuality assessment to perform her assessment of Paul.[6] Marketing literature given with the assessment indicates that its use "... is not designed to be predictive or diagnostic when used as an isolated tool. It assists clinicians in uncovering information to be used in conjunction with other clinical interview

---

[6] One other sexuality consent assessment widely used by New York State OPWDD certified habilitation providers, and by habilitation providers nationally and in Canada, is the YAI Sexuality Consent Assessment.

and assessment strategies." Dr. Carey-Shaw did not interview the Forzianos or Hava prior to administering her assessment of Paul.

88. Not surprisingly, Dr. Carey-Shaw stated in her report of the assessment that Paul was not capable of giving consent to sexual activity.

89. If properly administered, the SSKAAT-R assessment can lead to an understanding of a person's baseline knowledge of matters related to the ability to consent to sexual activity.

90. The proper administration of a sexual consent assessment is embodied in the Mental Hygiene Law, OPWDD regulations and New York common law. See, "A Handbook for All OMRDD Providers Part 624, Revised 10/27/11, Appendix 3, Considerations for Consent to Sexual Contact." The **"SEXUAL CONTACT"** section of Appendix 3 of the Part 624 Handbook, provides:

> **"The evaluation of a person is a highly individualized process that is based upon clinical expertise; upon staff's knowledge of the person and personal observation; and the input of significant others, including family members and guardians."** Part 624 Handbook, Appendix 3, page 282.

91. Appendix 3 of the Part 624 Handbook requires specialized education and training services to be provided for Paul and Hava to meet their particular needs for understanding of sexuality issues they encounter as an intimate, and ultimately married, couple:

> **"Education, training and specialized services should be available on an ongoing basis, and provided to meet each person's changing needs and changing level of understanding. Sexuality education should also include....Relationship-building, support and assistance to couples, social skills, decision making (including whether or not to abstain from sexual contact), values clarification, dating, grooming, hygiene, sexually transmitted diseases, birth control and family planning, parenting, pre-marital and marital counseling, and childbirth education."** Part 624 Handbook, Appendix 3, page 283.

92. Dr. Carey-Shaw's SSKAAT-R assessment of Paul Forziano failed to follow the protocol set forth in Appendix 3 of OPWDD's Part 624 Handbook because she did not interview the

FORZIANOS or Hava before she administered the assessment. The assessment is therefore unreliable.

93. Dr. Carey-Shaw's assessment is also unreliable because a conflict-of-interest existed between her duty to objectively administer the assessment and her personal and employment related opposition to Paul and Hava's desire to be married and cohabit in Paul's group home. Dr. Carey-Shaw is governed by ethical considerations applicable to psychologists. She should have insisted that the assessment be performed by an independent qualified mental health professional.

94. For the foregoing reasons, Dr. Carey- Shaw's conclusion that Paul "is not able to provide informed consent to participate in a sexual relationship" should not have been used by IGHL as a basis to deny Paul and Hava the ability to live together as a married couple in IGHL's supervised IRA, or to deny them their right to spend a reasonable amount of intimate, private time together before their marriage in their group homes.

95. Following Dr. Carey-Shaw's assessment of Paul, his parents promptly and repeatedly sought assistance from Dr. Carey-Shaw in obtaining appropriate education and training of Paul in any matters where Dr. Carey-Shaw concluded that he had knowledge deficits necessary to gain consent to sexual contact.

96. Dr. Carey-Shaw responded to these repeated requests for education and training by stating that IGHL does not provide such education or training, and that it is very hard to find qualified persons for such education and training. Dr. Carey-Shaw did not provide any referrals to outside agencies for this education or training.

97. OPWDD's Part 624 Handbook, Appendix 3, requires agencies to train:

**"Staff, volunteers, and interns … in human relationships, sexuality, the rights of persons with disabilities to sexual expression, and in the laws, regulations, and policies**

20

**regarding consent to sexual contact,** *and in techniques to impart such knowledge to persons with disabilities.*" (Italics added). Part 624 Handbook, Appendix 3, page 285.

98. Prior to the August 24, 2010 meeting, defendant MARYHAVEN administered two sexual consent assessments to Hava Samuels. One occurred in 2000 and the other in 2008. In neither circumstance were the Samuels interviewed for the assessments. Paul Forziano was not interviewed after the 2008 assessment even though MARYHAVEN was aware of Paul and Hava's relationship. Upon information and belief, MARYHAVEN did not provide Hava with any sex education or training either before or after it administered the 2000 and 2008 assessments.

99. Prior to the August 24, 2010 meeting Hava's parents repeatedly asked MARYHAVEN employees and administrators for education and training of Hava in areas related to her ability to consent to sexual activity. They were told that MARYHAVEN does not provide those services.

100.    Around the time of the August 24, 2010 meeting with the defendants, the Samuels learned through their own research about the role of sexual consent assessments in the OPWDD system, and the education and training protocols that MARYHAVEN was required to follow which are set forth in Appendix 3 of the Part 624 Handbook.

101.    After the August 24, 2010 meeting, as a result of MARYHAVEN's professed opposition to Paul and Hava's desire to marry and cohabit, and its failure to properly administer the prior two sexuality consent assessments, the Samuels asked MARYHAVEN to provide sex education and training for Hava at her bi-annual ISP meetings. MARYHAVEN did not offer to perform an updated sexuality consent assessment for Hava Samuels after the August 24, 2010 meeting.

102.    The parents reached out to other OPWDD certified group home providers to see if they had potential homes for Paul and Hava as a married couple. They were told that although they welcome married couples in their homes, they had no placements that would be available within any reasonable time into the future.

103.    Upon information and belief, the availability of group home placements for adults with ID is very limited in New York State, and waiting lists for such homes can take up to several years before homes become available.

104.    Paul and Hava's only need for accommodations are to live in a supervised IRA close in geographical proximity to their parents and to the Maryhaven Day Program, which has been the core of their personal and social lives for years.[7]

105.    Paul's IGHL group home could readily accommodate Paul and Hava's desire to marry and cohabit with an existing, upstairs apartment that has a separate bathroom and kitchen that is not occupied by other residents. Upon information and belief, the apartment is not necessary for the home's operational use. The upstairs apartment was unoccupied at the time of the August 24, 2010 meeting.

106.    Since the August 24, 2010 meeting, Paul and Hava were stymied in their efforts to live together as a married couple because they could not move forward from the sexuality consent roadblock that the agencies and Mr. Lopez put before them at the August 24, 2010 meeting.

107.    Paul and Hava's only advocate besides their parents was Amiris Navarro. Shortly after the August 24, 2010 meeting Hava changed her MSC to Ms. Navarro.

---

[7] It is in the best interests of the mental health of Paul and Hava to live in a supervised IRA in close geographical proximity to their parents and to the Maryhaven Day Program. The Maryhaven Day Program is located in Port Jefferson Station, New York.

108. In mid-January, 2012 Roseann Forziano called Amiris Navarro to request a meeting with Mr. Lopez to ask him for his assistance in requiring IGHL and MARYHAVEN to provide Paul and Hava with appropriate education and training related to their ability to consent to sexual activity.

109. Ms. Navarro then called Mr. Lopez to relay the parents request for a meeting. He reportedly told Ms. Navarro that there was no point in meeting with him if Paul and Hava did not have the ability to consent to sexual activity.

110. Both sets of parents then sent a jointly signed letter to Mr. Lopez dated January 29, 2012 which gave him a detailed history of their efforts to comply with his request to obtain consent by Paul and Hava to sexual activity and expressed their frustration at the resistance from IGHL and MARYHAVEN to provide any education or training in the area of sexual consent, and the lack of assistance in obtaining unbiased consent assessments. The letter gave a history of their unsuccessful efforts to reach out to other agencies for housing for Paul and Hava. The letter quoted from the Mental Hygiene Law and Appendix 3 of the Part 624 Handbook to explain why they believed that IGHL and MARYHAVEN had failed in their duties to Paul and Hava. Finally, the letter asked Mr. Lopez to meet Paul and Hava in the hope that he would see how devoted they are to each other and advocate for them with IGHL and MARYHAVEN.

111. Mr. Lopez then called the Forzianos in response to their letter. In this phone conversation he acknowledged their frustrations but did not discuss any specifics with them about reaching solutions to their problems with IGHL and MARYHAVEN other than to repeat that Paul and Hava had to have consent to sexual activity to move forward if they wanted to live together

as a married couple in OPWDD housing. He did say that if they wanted him to set up a meeting with IGHL and MARYHAVEN he would set that up.

112.  Mr. Lopez again failed to direct IGHL and MARYHAVEN to accommodate Paul and Hava's request to reside as a married couple in one of their respective group homes, or to treat their inability to obtain a reasonable accommodation from IGHL or MARYHAVEN as a basis to initiate a search for other appropriate OPWDD group homes in their area.

113.  Following this phone conversation, the parents contacted legal counsel to consult about Paul and Hava's legal rights to marry and live together either in IGHL or MARYHAVEN homes. Research by plaintiffs' counsel uncovered the existence of the YAI Sexuality Assessment which is available to persons with developmental disabilities such as plaintiffs.

114.  Even though plaintiffs believed that Paul and Hava were not required by Mental Hygiene Law to obtain consent to sexual activity in order to marry each other, the parents quickly became members of the YAI network, applied for YAI's sexual consent assessment and obtained specialized educational materials published by YAI that help prepare individuals for the YAI sexual consent assessment. The educational materials can be administered by parents or guardians. Paul and Hava's parents instructed them in the YAI materials.

115.  Plaintiffs were contacted by Grazyna Kusmierska, Ph.D., a psychologist associated with YAI to schedule YAI Sexuality Assessments for Paul and Hava.

116.  Dr. Kusmierska schedule meetings on the same day with Paul, Hava and their parents. She obtained a history of Paul and Hava and their relationship from interviews with Paul, Hava and the parents. She met with Paul separately, Hava separately and Paul and Hava together. The meetings permitted Dr. Kusmierska to get comfortable with Paul and Hava and vice versa, in order to facilitate her ability to administer sexuality assessments to them.

24

117. On June 14, 2012 Dr. Kusmierska conducted a YAI Sexuality Consent Assessment of Paul Forziano. On June 21, 2012 Dr. Kusmierska conducted a YAI Sexuality Consent Assessment of Hava Samuels. She issued reports of both assessments dated June 27, 2012. Both reports were reviewed and approved by Katharina Anger, Ph.D., a member of a YAI Center for Specialty Therapy.

118. Dr. Kusmierska found that both Paul and Hava are able to give verbal informed sexual consent.

119. Following receipt of Dr. Kusmierska's assessments, Paul and Hava's parents called Ms. Navarro to set up a meeting with Mr. Lopez.

120. A meeting was held on July 30, 2012. It was attended by Mr. Lopez, Margaret Stadnicky, who is a Community Service Administrator for LIDDSO, Paul and Hava's parents and Ms. Navarro. Upon information and belief, Mr. Lopez knew about the assumption of the capacity to consent to sexual contact given to married persons with DD. With that knowledge in mind, Mr. Lopez asked the Forzianos and the Samuels whether Paul and Hava were married. The parents responded that Paul and Hava were not yet married, but had become engaged on May 4, 2011.

121. The parents gave Bob Lopez a copy of Dr. Kusmierka's assessment reports and then asked him to do whatever he could to require IGHL or MARYHAVEN to allow Paul and Hava to live together in one of their respective homes when they marry. Mr. Lopez acknowledged the assessments and then asked them what they thought IGHL and MARYHAVEN would do upon learning of the assessments. The parents told him they believed that neither IGHL nor MARYHAVEN would ever voluntarily allow Paul and Hava

25

to live together in one of their homes once they get married. Mr. Lopez replied that they were probably correct in their conclusions about IGHL and MARYHAVEN.

122.    The parents then asked Mr. Lopez if there was anything he could do to force IGHL or MARYHAVEN to accept Paul and Hava as a married couple in their group homes. Mr. Lopez replied that despite his personal feelings about the matter, he had no power to force IGHL or MARYHAVEN to permit Paul and Hava to live together in their homes, nor could he take sides between Paul and Hava and the agencies because he has to act impartially in the matter. He stated that the two agencies could refuse to permit Paul and Hava to live together in either home.

123.    Upon information and belief, when Mr. Lopez received notice that Paul and Hava had been found capable of giving consent to sexual activity through the YAI assessments he should have directed IGHL and MARYHAVEN to consider the evaluations and revise their determinations. Instead of taking actions that could force IGHL and MARYHAVEN to follow the Mental Hygiene Law, Mr. Lopez abdicated his duty to oversee IGHL and MARYHAVEN and lead the plaintiffs to believe that IGHL and MARYHAVEN's actions were lawful.

124.    At the July 30, 2012 meeting Mr. Lopez then suggested that the parents find other group homes that may be willing to accept Paul and Hava.

125.    The parents informed Mr. Lopez of their prior attempts to seek alternative housing to accommodate Paul and Hava, which were unsuccessful.

126.    Contrary to the Mental Hygiene Law and regulations, Mr. Lopez continued to refuse to direct IGHL and MARYHAVEN to accommodate Paul and Hava's request to reside together as a married couple in one of their respective group homes, and never offered the assistance

26

of OPWDD to locate other certified group homes, or if necessary, create alternative certified group homes suitable to their needs as a married couple.

127.   Mr. Lopez warned Paul and Hava's parents that if they wanted to take legal action against IGHL and MARYHAVEN they should expect those agencies to fight and that Paul and Hava are likely to suffer as a consequence. He said that in his experience if you get to a certain point where there is no trust left between families and the agency the best thing to do is move on to another agency.

128.   Despite plaintiffs' eligibility to reside in OPWDD supervised IRA group homes, Mr. Lopez advised the Forzianos and the Samuels that they could take Paul and Hava back into their homes as a solution. The parents asked Mr. Lopez what happens when they pass away.[8] Mr. Lopez' response was that you can provide for them at home and that maybe you will have 15 good years before they had to worry about it.

129.   On September 10, 2012 the Forzianos and Samuels sent letters to IGHL and MARYHAVEN, respectively, which asked both agencies to reconsider their opposition to permitting Paul and Hava to live together as a married couple in their homes. The letters also asked the two agencies to permit private, intimate time between Paul and Hava in the meantime. Also enclosed with the letters were copies of the YAI assessment reports from Dr. Kusmierska and letters to the Surrogate's Court by both sets of parents relinquishing powers they have over the marriage of Paul and Hava to each other.

130.   By letter dated September 24, 2012 Mr. Trakoval from IGHL responded to the letter by writing that "As an organization, we have significant concerns regarding the appropriateness of these decisions, how the apparent 'ability to consent to sexual activity' was obtained, and the practicality of a married couple living in a group home with other non-married peers."

---

[8] . Frank Forziano is 61. Roseann Forziano is 59. Norm Samuels is 67. Bonnie Samuels is 64.

The decisions Mr. Trakoval referred to were the desire by Paul and Hava to marry and live together in one of their two respective supervised IRAs.

131.    In his September 24, 2012 response, Mr. Trakoval went on to write that "Group-oriented homes managed by IGHL are not staffed or designed to house and supervise married couples or assist married couples with the dynamics of their relationships, sexual or otherwise; again, married couples traditionally do not need such supervision. Such homes are also not designed to manage the social, privacy and rights issues that would exist with unmarried persons living in such close quarters with a married couple, nor should they be."

132.    Mr. Trakoval's response is contrary to Mental Hygiene Law and regulations which require OPWDD facilities to support their clients' abilities to develop meaningful relationships with others in a home of their choice, and to support them in their desires to achieve the personal goals they choose for themselves, and the requirement under the Americans with Disabilities Act and Fair Housing Act to provide reasonable accommodations to clients like the plaintiffs who seek to marry and cohabit in supervised IRA housing.

133.    Trakoval's response stands in stark contrast to IGHL's obligation to provide its clients with:

**Education, training and specialized services ... on an ongoing basis ... to meet each person's changing needs and changing level of understanding. Sexuality education should also include ....Relationship-building, support and assistance to couples, social skills, decision making (including whether or not to abstain from sexual contact), values clarification, dating, grooming, hygiene, sexually transmitted diseases, birth control and family planning, parenting, pre-marital and marital counseling, and childbirth education.**" Part 624 Handbook, Appendix 3, page 283.

134.    By letter dated October 1, 2012 Lewis Grossman, CEO of MARYHAVEN, indicated that MARYHAVEN rejected the YAI assessment result for Hava and would continue to rely on

28

the previous sexuality consent assessments that MARYHAVEN performed in 2000 and 2008.

135. Mr. Grossman's rejection of the YAI assessments of Paul and Hava, without any reasonable grounds for the rejection, while adhering to outdated and methodologically unsound internal assessments, supports a conclusion that MARYHAVEN acted intentionally to violate plaintiffs' civil rights to marry and cohabit in Hava's group home.

136. It is undisputed that IGHL and MARYHAVEN must permit, and presumably would permit, adults living in their group homes to engage in sexual relations if they are capable of consenting to sexual contact, and facilitate privacy for sexual activity to occur. It is with a cruel irony, therefore, that both of these defendants would categorically deny the plaintiffs and others similarly situated with the ability to reside as a married couple in their IRA supervised group homes, but permit unmarried couples to engage in sex in their homes.

137. By letters dated October 24, 2012 counsel for the plaintiffs sent a demand letter to Mr. Lopez for OPWDD/LIDDSO, IGHL and MARYHAVEN, setting forth plaintiffs requests for a reasonable accommodation to marry and live together in one of the two group homes, such as the upstairs apartment in Paul Forziano's group home; or in an alternate group home within reasonable geographical proximity to their families and to the Maryhaven Day Program. The letters requested a housing option to be provided as a reasonable accommodation by April 7, 2013 when Paul and Hava will be married. The letters also requested a response within 30 days or plaintiffs would be forced to file a lawsuit seeking relief for the plaintiffs.

138. By letter dated December 10, 2012, Kevin A. Seaman, Esq., responded for defendant IGHL to the plaintiffs' demand letter. Seaman reiterated that IGHL was not set up to

29

accommodate a married couple. Seaman's letter rejected plaintiffs' assertion that the refusal of IGHL to allow Paul and Hava to live together as a married couple constitutes discrimination under Title III of the Americans with Disabilities Act and the Fair Housing Act.

139.   OPWDD and MARYHAVEN have not responded to plaintiffs demand letter to accommodate Paul and Hava's desire to marry and cohabit in an OPWDD supervised IRA by the date of their marriage.

140.   Plaintiffs assert that defendant OPWDD violated Title II of the ADA on several grounds, including (1) acquiescing in the denial by defendants IGHL and MARYHAVEN of plaintiffs' request to live together as a married couple in co-defendants' supervised IRA group homes on the basis of their intellectual disabilities, thereby aiding or perpetuating discrimination by IGHL and MARYHAVEN, (2) in denying plaintiffs supervised IRA housing as a married couple even though it knowingly provides such housing to other married couples similarly situated to the plaintiffs, and permits unmarried residents to engage in private sexual activities, (3) in administering its statutory and regulatory duties towards the plaintiffs in such a manner as to effectively deny plaintiffs the ability to cohabit as a married couple simply because they reside in group homes operated by entities under OPWDD's regulatory control that refuse to accommodate plaintiffs housing needs as a married couple, (4) administering the state's DD program in such a manner as to substantially impair plaintiffs ability to accomplish objectives of the state's DD program, in particular, the ability to cohabit as a married couple, and thereby to achieve the highest level of independence and personal achievement that they can achieve within the limitations of their intellectual disabilities, (5) in failing to make all necessary reasonable modifications to their services,

30

programs and activities, including but not limited to providing Paul and Hava with a room in either of their group homes in which they could cohabit as a married couple, and (6) failing to administer OPWDD's services, programs, and activities in the most integrated setting appropriate to the needs of the plaintiffs.

141.    The state has chosen to utilize private entities like IGHL and MARYHAVEN to perform its statutory duties to provide habilitation and rehabilitation to plaintiffs and other persons with developmental disabilities who are similarly situated to the plaintiffs. The state's statutory and regulatory laws protecting New York citizens with developmental disabilities do not give private group home operators like IGHL and MARYHAVEN any authority to violate Paul and Hava's civil rights; nor can the state acquit itself of its statutory duties towards the plaintiffs simply by delegation of the performance of those duties to IGHL and MARYHAVEN. Rather, the Mental Hygiene Law requires OPWDD to oversee IGHL and MARYHAVEN to ensure that they do not violate plaintiffs' civil rights, and to direct or otherwise force IGHL and MARYHAVEN to cease violating plaintiffs' civil rights.

142.    Mr. Lopez knew of IGHL and MARYHAVEN's refusal to provide plaintiffs' with their requested accommodations at least since August 24, 2010; and knew of IGHL and MARYHAVEN's categorical objection to providing plaintiffs with the ability to cohabit as a married couple in their homes, even if plaintiffs then had, or were later able to gain, the capacity to consent to sexual activity.

143.    Despite Mr. Lopez' knowledge as set forth above, he failed to take timely action to inform IGHL and MARYHAVEN of their Mental Hygiene Law obligations to provide supervised IRA housing options for Paul and Hava, or to require them to assist the plaintiffs

in obtaining education, training and evaluation for Paul and Hava to obtain consent to sexual activity.

144.    Defendant OPWDD's knowing failure to assist the plaintiffs in any materially effective manner to date constitutes deliberate indifference to plaintiffs' civil rights complained of herein.

145.    As a result thereof, plaintiffs have been delayed unnecessarily in their plans to marry and continue to be denied reasonable private, intimate time together in their respective group homes. Upon the event of their marriage, plaintiffs will be further emotionally and physically injured by an inability to cohabit as husband and wife in supervised IRA housing.

146.    Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in a supervised IRA group home will be denied, as will their ability to have a reasonable degree of private intimate time with each other in their existing group homes from this date forward.  Plaintiffs seek damages therefore. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

### FOR A SECOND CAUSE OF ACTION UNDER TITLE III OF THE AMERICANS WITH DISABILITIES ACT AGAINST IGHL AND MARYHAVEN

147.    Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

148.    Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 et seq., ("Title III of the ADA") applies to the owners, lessees, lessors, and operators of places of public accommodation.

149. Included among places of public accommodation are social service center establishments. 42 U.S.C. § 12181(7)(K). Group homes are considered covered social service center establishments. See, 28 C.F.R. § 36.406(a) – Appendix.

150. Title III of the ADA provides generally that "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

151. Additional general and specific statutory provisions of Title III of the ADA are applicable to the discrimination faced by the plaintiffs include 42 U.S.C. §§ 12182(b)(1)(A)-(B),(D) and 42 U.S.C. § 12182(b)(2)(A)(ii). These sections are quoted below at length:

> "Denial of participation. It shall be discriminatory to subject an individual or class of individuals on the basis of disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i).

> "Participation in unequal benefit. It shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A)(ii).

> "Separate benefit. It shall be discriminatory to provide an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly or through contractual, licensing, or other arrangements with a good, service, facility, privilege, advantage, or accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a good, service, facility, privilege, advantage, or accommodation, or other opportunity that is as effective as that provided to others." 42 U.S.C. § 12182(b)(1)(A)(iii).

"Individual or class of individuals. For purposes of clauses (i) through (iii) of this subparagraph, the term individual or class of individuals refers to the clients or customers of the covered public accommodation that enters into the contract, licensing or other arrangement." 42 U.S.C. § 12182(b)(1)(A)(iv).

"Integrated settings. Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual." 42 U.S.C. § 12182(b)(1)(B).

"Administrative methods. An individual or entity shall not, directly or through contractual or other arrangements, utilize standards or criteria or methods of administration

(i)     that have the effect of discriminating on the basis of disability;

or

(ii)    that perpetuate the discrimination of others who are subject to a common administrative control." 42 U.S.C. § 12182(b)(1)(D).

"Discrimination. For purposes of subsection (a), discrimination includes

... (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such gods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

152.    Plaintiffs belong to a class of persons who are married or live in a long-term, intimate

relationship with each other and whom have intellectual disabilities of a degree that require

residence in a supervised IRA.

153.    Defendants IGHL and MARYHAVEN claim that plaintiffs do not have the mental

capacity to marry and cohabit in the supervised IRA's operated by defendants. In asserting

this claim, defendants rely on self-serving and biased assessments which were not supported

by mandated sexuality education and training, and relationship counseling relevant to Paul

and Hava's needs.

154. Defendant IGHL, and upon information and belief, defendant MARYHAVEN, further claim that they are not capable of providing facilities and services to the plaintiffs as a married couple even if plaintiffs have the capacity to consent to sexual activity. Rather, than accommodating plaintiffs' request for a reasonable accommodation, defendants told plaintiffs that if they marry they should seek living arrangements in a supported IRA operated by another agency, or at home. Defendants' statements and actions were done in violation of the Mental Hygiene Law and OPWDD regulations and policy, and constitute unlawful discrimination under Title III of the ADA.

155. Defendants have denied plaintiffs reasonable private, intimate time together in their respective group homes. Defendant MARYHAVEN has even gone so far as to communicate a policy to plaintiffs that discourages intimacy while at the MARYHAVEN group home.

156. Defendants have denied plaintiffs any resources to educate and train themselves in sexual education matters, and in seeking necessary, independent evaluations to gain knowledge of their ability to consent to sexual activity.

157. All of the foregoing actions of the defendants discriminate against plaintiffs on the basis of their mental abilities. These actions also contravene specific statutory, regulatory, licensing certification and contractual obligations placed upon the defendants by the Mental Hygiene Law and OPWDD regulations.

158. As a result thereof, plaintiffs have been delayed unnecessarily in their plans to marry and continue to be denied reasonable private, intimate time together in their respective group homes. Upon the event of their marriage, plaintiffs will be further emotionally and physically injured by an inability to cohabit as husband and wife in supervised IRA housing.

159. Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in a supervised IRA residence will be denied, as will their ability to have a reasonable degree of private intimate time with each other in their existing group homes from this date forward. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

### FOR A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS UNDER THE FAIR HOUSING ACT, AS AMENDED, 42 U.S.C. 3601

160. Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

161. The Fair Housing Act ("FHA") prohibits discrimination against individuals on the basis of their disabilities in the sale, rental or terms, conditions, or privileges of the sale or rental of a dwelling. 42 U.S.C. § 3604(f).

162. Under subsection 3604(f)(1) and (2) of the FHA it is unlawful for defendants:

> **"(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—**
>
> **(A) that buyer or renter,**
>
> **(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or**
>
> **(C) any person associated with that buyer or renter."**
>
> **"(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—**
>
> **(A) that person; or**
>
> **(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or**

(C) any person associated with that person."

163. Under subsection 3604(f)(3)(B) of the FHA discrimination also includes:

**"(B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."**

164. Defendants are also prohibited from discriminating against plaintiffs on the basis of their impending marriage in the terms, conditions, or privileges associated with their residence in defendants' group homes. 42 U.S.C. § 3604(b). That subsection makes it unlawful for defendants:

**"To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, *familial status*, or national origin."** (Italics added).

165. Defendants IGHL and MARYHAVEN categorically prohibit plaintiffs and other individuals with developmental disabilities living in or seeking to live in their supervised IRA group homes from cohabiting as married couples.

166. Defendants also failed to provide plaintiffs with their requests for reasonable accommodation, such as converting the upstairs apartment at Paul Forziano's group home into an apartment for Paul and Hava.

167. For the reasons set forth in foregoing allegations of this Complaint, defendants actions discriminate against plaintiffs on the basis of their mental abilities and their impending status as a married couple under the FHA in the terms, conditions, and privileges associated with their residence in defendants' group homes.

168. Specifically, defendants IGHL and MARYHAVEN oppose plaintiffs' residence in their group homes as a married couple because they deem plaintiffs unsuited mentally for

marriage and cohabitation, and because they categorically deem their group homes unsuitable for married couples generally.

169. Defendant OPWDD discriminates against the plaintiffs because it funds, regulates, certifies and oversees the activities of IGHL and MARYHAVEN, and despite having knowledge of the discriminatory behavior of defendants IGHL and MARYHAVEN and of plaintiffs requests to modify defendants discriminatory policies, practices and procedures, and being possessed of the statutory power to order defendants IGHL and MARYHAVEN to cease and desist from their discriminatory behavior, OPWDD has acquiesced and permitted IGHL and MARYHAVEN to discriminate against the plaintiffs.

170. As a result thereof, plaintiffs have been delayed unnecessarily in their plans to marry and continue to be denied reasonable private, intimate time together in their respective group homes. Upon the event of their marriage, plaintiffs will be further emotionally and physically injured by an inability to cohabit as husband and wife in supervised IRA housing.

171. Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in supervised IRA residence will be denied, as will their ability to have a reasonable degree of private intimate time with each other in their existing group homes from this date forward. Plaintiffs seek damages therefore. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

**FOR A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION AND THROUGH 42 U.S.C. § 1983**

172. Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

173.  The right to enter into marriage without discrimination on the basis of disability is a civil right fundamental to citizens of this nation. That right is provided protection by the due process clause of the 14th Amendment to the United States Constitution from penalty or interference by states, and those persons or entities acting under the color of state law.

174.  State sanctioned penalty or interference with the status of marriage on the basis of disability also implicates protections provided by the 14th Amendment right to equal protection of law.

175.  Defendants' policies, practices and procedures complained of herein have unduly interfered with plaintiffs' desire to marry by arbitrarily and illegally preventing plaintiffs from cohabiting together as married persons, on the basis of their disabilities, in defendants' supervised IRA group homes, despite the existence of a state statutory scheme that permits and even encourages such marriage and cohabitation by plaintiffs and similarly situated persons; and upon the event of plaintiffs' marriage, defendants' policies, practices and procedures complained of herein will prevent plaintiffs from cohabiting together as a married couple in defendants' supervised IRA group homes, and will thereby impose a substantial penalty upon plaintiffs for entering into marriage.

176.  Defendants' policies, practices and procedures complained of herein violate plaintiffs' substantive due process rights under the 14th Amendment to the United States Constitution because they arbitrarily, unlawfully and deliberately penalize and interfere with plaintiffs' right to marry by denying them the ability to cohabit as a married couple in defendants supervised IRA group homes.

177.  The policies, practices and procedures of defendants complained of herein violate plaintiffs' equal protection rights under the 14th Amendment to the United States Constitution

because defendants refuse to permit plaintiffs to cohabit in defendants supervised IRA group homes as a married couple, while proving habilitation to unmarried persons in supervised IRA group homes, and because defendant OPWDD permits similarly situated married couples to cohabit in supervised IRA group homes operated by non-party private agencies under its oversight and control, but refuses to permit plaintiffs to enjoy the same right.

178. As a result thereof, plaintiffs have been delayed unnecessarily in their plans to marry and continue to be denied reasonable private, intimate time together in their respective group homes. Upon the event of their marriage, plaintiffs will be further emotionally and physically injured by their inability to cohabit as husband and wife in supervised IRA housing. Plaintiffs seek damages therefore.

179. Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in supervised IRA residence will be denied, as will their ability to have a reasonable degree of private intimate time with each other in their existing group homes from this date forward. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

## FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS UNDER THE FEDERAL MEDICAID STATUTE AND THROUGH 42 U.S.C. § 1983

180. Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

181. Medicaid is a joint federal-state program of medical assistance established by Title XIX of the Social Security Act through which the federal government reimburses a portion of medical expenses incurred by states for providing services to low-income people, including those with developmental disabilities. 42 U.S.C. § 1396, *et seq.*

182. States do not need to accept Medicaid, but if they do then the recipient state must comply with certain federal requirements, such as administering the state Medicaid programs pursuant to state plans approved by the United States Department of Health and Human Services ("state plan"). 42 U.S.C. 1396a.

183. One of the requirements of the federal Medicaid Statute is the obligation to ensure that Medicaid assistance provided pursuant to a state plan to medically needy eligible individuals:

**"(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and**

**(ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A)."** 42 U.S.C. 1396a(a)(10)(B).

184. Defendants have an obligation to provide plaintiffs and other similarly situated medical needy persons with developmental disabilities with education and training in sexuality, relationships, and matters related to marriage and family planning:

**Education, training and specialized services ... on an ongoing basis ... to meet each person's changing needs and changing level of understanding. Sexuality education should also include ... .Relationship-building, support and assistance to couples, social skills, decision making (including whether or not to abstain from sexual contact), values clarification, dating, grooming, hygiene, sexually transmitted diseases, birth control and family planning, parenting, pre-marital and marital counseling, and childbirth education."** Part 624 Handbook, Appendix 3, page 283.

185. To meet this obligation, direct providers of rehabilitation and habilitation services must educate and train:

**"Staff, volunteers, and interns ... in human relationships, sexuality, the rights of persons with disabilities to sexual expression, and in the laws, regulations, and policies regarding consent to sexual contact, *and in techniques to impart such knowledge to persons with disabilities.*"** (Italics added). Part 624 Handbook, Appendix 3, page 285.

186. Payment for education, training and counseling provided to clients in sexuality education, relationship counseling, marital counseling and family planning are examples of "Allowable

services" subject to Medicaid reimbursement, as set forth in 14 NYCRR § 671.5(a)(4)(v) and (vi):

**"(4) Categories of allowable services.**
...
**(v) Functional skills training services. Activities, interventions and therapies which are designed to develop skills and enhance capacities (or limit regression) to engage in the primary activities of daily life. Services are provided by addressing areas of functioning such as: dressing, personal hygiene and grooming, selection and/or preparation of food, cleaning and washing of clothes, maintenance of the personal environment, budgeting and money management, education in general health, family planning and use of community resources such as public transportation. Training is intended to increase those competencies needed by the individual to live in his or her chosen environment."**

**(vi) Assertiveness/self-advocacy skills training services. Activities, interventions, and therapies which promote the person's ability to assess and utilize his or her strengths and capacity to make life status changes and to increase self-awareness about his or her values and preferences. Training also focuses on increasing a person's ability to respond to medical, safety and other personal problems. Activities are also intended to improve communication skills and facilitate appropriate interpersonal behavior."**

187.   Defendants IGHL and MARYHAVEN refused to provide plaintiffs with any sexuality education, relationship counseling, marital counseling, or family planning services despite repeated requests by plaintiffs for such counseling.

188.   Defendant OPWDD had specific knowledge that defendants IGHL and MARYHAVEN refused to provide such counseling for plaintiffs.

189.   Upon information and belief, defendant OPWDD certifies and funds other supervised IRA providers who provide such services to their clients.

190.   Upon information and belief, defendant OPWDD was aware that plaintiffs and other clients in supervised IRA group homes operated by defendants IGHL and MARYHAVEN were not receiving comparable, allowable Medicaid services related to sexuality education, relationship counseling, marital counseling and family planning that other OPWDD funded

clients received whom resided in supervised IRA facilities operated by other certified group home providers.

191.    This disparity among providers in functional skills training services and assertiveness/self advocacy skills training rehabilitation services violates subsection 1396a(a)(10(B) of the federal Medicaid Statute.

192.    OPWDD, IGHL and MARYHAVEN were deliberately indifferent to plaintiffs' rights under the federal Medicaid Statute to receive comparable Medicaid rehabilitation services.

193.    Marriage and cohabitation in OPWDD supervised IRA group homes are as fundamental to the rehabilitation and habilitation goals of the federal Medicaid Statute and the Mental Hygiene Law as budgeting, performing household chores and taking public transportation. Habilitation is a reimbursable Medicaid service, as set forth in 14 NYCRR § 671.7.

194.    OPWDD operates a statewide system of habilitation that funds married couples cohabiting in supervised IRA facilities operated by providers other than defendants IGHL and MARYHAVEN, but acquiesces in the categorical refusal of defendants IGHL and MARYHAVEN to provide such habilitation services.

195.    This dual system of funding violates plaintiffs rights under 42 U.S.C. § 1396a(a)(10)(B).

196.    Defendant OPWDD has been aware of the categorical refusal of defendants IGHL and MARYHAVEN to permit married couples to cohabit in their certified supervised IRA group homes since, at least, August 24, 2010 and has tolerated and supported IGHL and MARYHAVEN's refusal to provide comparable Medicaid habilitation services to plaintiffs since then.

197.    Defendants IGHL and MARYHAVEN are obligated to comply with the Mental Hygiene Law and other applicable laws such as 42 U.S.C. § 1396a(a)(10)(B), and to assist OPWDD in

complying with those laws by MHL 16.13(a), and by virtue of their acceptance of Medicaid funding for their rehabilitation and habilitation services provided to plaintiffs and other Medicaid eligible clients.

198.    Defendants are deliberately indifferent to the rights of plaintiffs and other similarly situated persons to have comparable Medicaid habilitation services as married couples cohabiting in the same group home.

199.    As a result of defendants' violations of the federal Medicaid Statute, plaintiffs spent their own money to obtain sexuality education and counseling, relationship counseling, and independent sexuality assessments. Plaintiffs seek damages therefore.

200.    Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in a supervised IRA residence of their choice will be denied. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

### FOR A SIXTH CAUSE OF ACTION AGAINST DEFENDANTS IGHL AND MARYHAVEN UNDER NEW YORK STATE EXECUTIVE LAW § 296(a)

201.    Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

202.    The New York State Executive Law § 290 et seq. ("Human Rights Law") provides equivalent or greater civil rights protections for persons with disabilities than are provided by the ADA, including the right to compensatory damages.

203.    Section 296 of the Human Rights Law provides similar protections to plaintiffs compared with the protections provided under Title III of the ADA and the FHA, except that the Human Right Law also provides for compensatory damages in addition to injunctive and

44

declaratory relief, whereas Title III of the ADA only provides plaintiffs with injunctive and

declaratory relief. Human Rights Law § 297(9).

204.    In relevant part, the Human Rights Law provides that:

> **"It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof...."** Human Rights Law § 296(2)(a).

> **"For the purposes of paragraph (a) of this subdivision, "discriminatory practice" includes:**

> **(i) a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities, unless such person can demonstrate that making such modifications would fundamentally alter the nature of such facilities, privileges, advantages or accommodations"** Human Rights Law § 296(2)(c).

> **"It shall be an unlawful discriminatory practice for the owner, lessee, sub-lessee, assignee, or managing agent of, or other person having the right of ownership of or possession of or the right to rent or lease housing accommodations:**
> **...**

> **(2) To refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford said person with a disability equal opportunity to use and enjoy a dwelling, including reasonable modification to common use portions of the dwelling...."** Human Rights Law § 296(18).

205.    For the reasons set forth in foregoing allegations of this Complaint, defendants actions

discriminate against plaintiffs on the basis of their mental abilities and their impending status

as a married couple under the FHA in the terms, conditions, and privileges associated with

their residence in defendants' group homes.

206.    Specifically, defendants IGHL and MARYHAVEN oppose plaintiffs' residence in their

group homes as a married couple because they deem plaintiffs unsuited mentally for

45

marriage and cohabitation, and because they categorically deem their group homes unsuitable for married couples generally.

207.   As a result thereof, plaintiffs have been delayed unnecessarily in their plans to marry and continue to be denied reasonable private, intimate time together in their respective group homes. Upon the event of their marriage, plaintiffs will be further emotionally and physically injured by an inability to cohabit as husband and wife in supervised IRA housing. Plaintiffs seek damages therefore.

208.   Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in supervised IRA residence will be denied, as will their ability to have a reasonable degree of private intimate time with each other in their existing group homes from this date forward. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

## FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS UNDER THE NEW YORK STATE MENTAL HYGIENE LAW

209.   Plaintiffs repeat and re-allege each of the foregoing allegations of fact and statements of law, and incorporate same herein as if fully set forth.

210.   The Mental Hygiene Law provides for specific, enforceable civil rights to plaintiffs, as set forth in Section 33.01 of the MHL:

**"...no person shall be deprived of any civil right, if in all other respects qualified and eligible, solely by reason of receipt of services for a mental disability.nor shall the receipt of such services modify or vary any civil right of any such person, including but not limited to civil service ranking and appointment, the right to register for and to vote at elections, or rights relating to the granting, forfeiture, or denial of a license, permit, privilege or benefit pursuant to any law." MHL § 33.01.**

211. Among those civil rights is the right to be married and cohabit in OPWDD supervised IRA programs like the programs operated by defendants IGHL and MARYHAVEN.

212. Defendants IGHL and MARYHAVEN refused to permit plaintiffs to cohabit as a married couple in their supervised IRA group homes on the basis of plaintiffs' degree of cognitive impairment despite a statutory obligation to assist OPWDD in complying with the Mental Hygiene Law, OPWDD regulations, and other applicable laws such as the Americans with Disabilities Act, the Fair Housing Act, the United States Constitution, The Federal Medicaid Statute and the New York State Executive Law:

**"It shall be the duty of every holder of an operating certificate issued pursuant to this article or organization whose incorporation or activities require the approval of the commissioner, or program funded or administered by the office to assist such office and the commission on quality of care for the mentally disabled in carrying out their respective regulatory and oversight functions by:**

**(a)Complying with the applicable provisions of this chapter, other applicable laws, and the regulations of the commissioner."** MHL § 16.13(a).

213. Defendant OPWDD knew of and acquiesced in the denial of plaintiffs' civil rights under the MHL, and failed or refused to utilize statutory powers of enforcement against defendants IGHL and MARYHAVEN to protect plaintiffs' civil rights.

214. Defendant OPWDD also violated plaintiffs' civil rights by failing to provide plaintiffs with alternative supervised IRA housing since August 24, 2010 when IGHL and MARYHAVEN explicitly announced their categorical opposition to marriage and cohabitation in their supervised IRA group homes by OPWDD funded clients even though it had a statutory obligation to provide appropriate habilitation and rehabilitation services to plaintiffs as eligible recipients of OPWDD's services.

215. Written and verbal statements of the defendants to plaintiffs that IGHL and MARYHAVEN categorically opposed clients' cohabitation in their supervised IRA group

homes as a married couple, and statements made by Mr. Lopez of OPWDD that he had no power to force IGHL and MARYHAVEN to permit plaintiffs to cohabit in one of their respective group homes, made it clear to plaintiffs that any further attempts to pursue relief through the offices of OPWDD would be futile.

216. As a result of defendants' refusal to comply with plaintiffs' civil rights under the Mental Hygiene Law, plaintiffs have been delayed unnecessarily in their plans to marry and continue to be denied reasonable private, intimate time together in their respective group homes. Upon the event of their marriage, plaintiffs will be further emotionally and physically injured by their inability to cohabit as husband and wife in supervised IRA housing.

217. Unless the Court provides plaintiffs with appropriate injunctive relief, their ability to cohabit as a married couple in supervised IRA residence will be denied, as will their ability to have a reasonable degree of private intimate time with each other in their existing group homes from this date forward. Plaintiffs also must ensure through injunctive relief that they will be able to access, as needed, relationship and marital counseling necessary to ensure the best chances of success in their future as a married couple.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for the following relief from the Court:

A.    Issue a permanent injunction against the defendants, requiring their agents, servants and employees, and all persons or entities in active concert therewith, to provide plaintiffs with supervised IRA housing as a married couple, such as the upstairs apartment in plaintiff Paul Forziano's group home, and to permit them to live together in the same room or space, upon the event of their marriage which

48

will occur on April 7, 2013 and to perform on a timely basis all administrative matters necessary to facilitate the foregoing;

B.    Issue injunctive orders permitting and facilitating the plaintiffs ability to spend private, intimate time together on a regular basis at each other's supervised IRA homes until they are married, and to obtain all relationship and marital counseling necessary to ensure their best chance of success in the future as a married couple;

C.    If it is impossible to provide permanent, supervised IRA housing as a married couple, in accordance with relief paragraph A, above, the defendants have the obligation to facilitate and provide interim extended cohabitation as a married couple in one or both of the supervised IRA homes where plaintiffs currently reside, on a regular basis, more often that once a week, as deemed by an independent qualified psychological or psychiatric professional to be in the best interests of the plaintiffs;

D.    Defendants must jointly pay for all services necessary to facilitate and provide interim and/or permanent supervised IRA housing for the plaintiffs, including independent psychological and/or psychiatric services, counseling and education services necessary to effectuate the relief set forth above;

E.    Enter declaratory judgment in favor of the plaintiffs specifying their rights under the federal and state causes of action brought against the defendants, and specifying in said declaration the defendants' violations of those federal and state laws.

F.    Award each plaintiff compensatory damages in a reasonable sum to be determined by the Court, as against each defendant, up to One Hundred Thousand

($100,000.00) Dollars, to the extent that plaintiffs prove frustration of their desire

to enjoy their non-marital and impending marital relationship with each other

through private and intimate time together in each other supervised IRA houses.

G.  Find that plaintiffs are prevailing parties in this lawsuit and award attorneys' fees,

costs and expenses against the defendants jointly and severally, and award such

other and further relief, at law or equity, to which the plaintiffs may be justly

entitled.

Dated:  Woodbury, New York
January 18, 2013

Martin J. Coleman, Esq.
Law Office of Martin J. Coleman, P.C.
100 Crossways Park West., Suite 412
Woodbury, New York 11797
(516) 802-5960; (516) 802-5961 (f)

Robert Briglio, Esq.
Nassau/Suffolk Law Services Committee, Inc.
1757 Veterans Highway
Islandia, New York 11749
(631) 232-2400; (631) 232-2489 (f)