UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ MAR 26 2014 ★

**LONG ISLAND OFFICE**



-----------------------------------------------------------X

FRANK FORZIANO and ROSEANN
FORZIANO as parents and Article 17A
co-guardians of PAUL FORZIANO, NORMAN
SAMUELS and BONNIE SAMUELS as parents
and Article 17A co-guardians of HAVA
SAMUELS, PAUL FORZIANO and HAVA
SAMUELS,

                     Plaintiffs,

       -against-

INDEPENDENT GROUP HOME LIVING
PROGRAM, INC., MARYHAVEN CENTER
OF HOPE, INC., and COURTNEY BURKE,
sued herein in her official capacity as the
COMMISSIONER OF THE NEW YORK STATE
OFFICE OF PERSONS WITH DEVELOPMENTAL
DISABILITIES and STATE OF NEW YORK,

                  Defendants.

MEMORANDUM AND ORDER

CV 13-0370

(Wexler, J.)

-----------------------------------------------------------X

APPEARANCES:

      LAW OFFICE OF MARTIN J. COLEMAN, P.C.
      BY:   Martin J. Coleman, Esq.
      Attorney for Plaintiffs
      100 Crossways Park Dr. West, Suite 412
      Woodbury, New York 11797

      ROBERT BRIGLIO, ESQ.
      BY:   Robert Briglio, Esq.
      Attorney for Plaintiffs
      115 Jackson Avenue
      Huntington, New York 11743

DEVITT SPELLMAN BARRETT LLP
BY:   Jeltje DeJong, Esq.
        Anne C. Leahy, Esq.
        David H. Arntsen, Esq.
Attorneys for Defendant Independent Group Home Living Program, Inc.
50 Route 111
Smithtown, New York 11787

BARTLETT, McDONOUGH & MONAGHAN, LLP
BY:   Anna I. Hock, Esq.
        Robert Frank Elliott, Esq.
Attorneys for Defendant Maryhaven Center of Hope, Inc.
170 Old Country Road
Mineola, New York 11501

ERIC T. SCHNEIDERMAN
ATTORNEY GENERAL OF THE STATE OF NEW YORK
BY:   Susan M. Connolly, Esq., Assistant Attorney General
300 Motor Parkway, Suite 205
Hauppauge, New York 11788

WEXLER, District Judge:

Before the Court are the Defendants' motions to dismiss Plaintiffs' Amended Complaint,

pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  Plaintiffs

oppose the motions.  For the following reasons, Defendants' motions are granted and this action

is dismissed in its entirety.

## BACKGROUND

This is a disability discrimination action in which Plaintiffs assert that Plaintiff Paul

Forziano ("Paul") and Plaintiff Hava Samuels ("Hava"), both of whom have developmental

intellectual disabilities and were recently married, have been denied the opportunity to cohabit in

a supervised group home by Defendants.  Plaintiffs allege that this denial amounts to a violation

of Paul and Hava's constitutional rights, as well as a failure by Defendants to provide Medicaid funded residential habilitation services, which are mandated by the New York State Mental Hygiene Law. (Am. Compl. ¶ 41.) Plaintiffs seek damages as well as declaratory and injunctive relief.

Plaintiff Paul Forziano has been classified since childhood as being in the mild to moderate range of intellectual functioning. (Am. Compl. ¶ 14.) As a result of his intellectual disabilities, Paul is eligible for and receives residential and day habilitation services provided through the federal Medicaid Waiver Program and funded by the New York State Office of Persons with Developmental Disabilities ("OPWDD"). (Am. Compl. ¶ 15.) Up until July 1, 2013, Pual's residential habilitation services were provided by Defendant Independent Group Home Living Program, Inc. ("IGHL"). (Am. Compl. ¶ 15.) Paul's day habilitation services are provided by Defendant Maryhaven Center of Hope, Inc. ("Maryhaven"). (Am. Compl. ¶ 15.)

Plaintiff Hava Samuels has been classified since childhood as being in the moderate range of intellectual functioning. (Am. Compl. ¶ 20.) As a result of her intellectual disabilities, Hava is eligible for and receives residential and day habilitation services through the federal Medicaid Waiver Program and funded by the OPWDD. (Am. Compl. ¶¶ 21, 24.) Up until July 1, 2013, Hava's residential habilitation services were provided by Defendant Maryhaven. (Am. Compl. ¶ 21.) Hava's day habilitation services continue to be provided by Maryhaven. (Am. Compl. ¶ 21.)

On April 7, 2013, Paul and Hava were married, after a courtship of seven years and an engagement of two years. (Am. Compl. ¶ 2.) Beginning in 2010, after Paul and Hava announced their desire to marry, their parents - Plaintiffs Frank and Roseann Forziano (the "Forzianos") and

Norman and Bonnie Samuels (the "Samuels") - began looking into ways for Paul and Hava to live together in one of their respective group homes. (Am. Compl. ¶¶ 84-94.)

On August 24, 2010, a meeting was held to discuss accommodating Paul and Hava's desire to marry and live together. (Am. Compl. ¶ 95.) During this meeting, representatives from both IGHL and Maryhaven (collectively, the "Group Home Defendants") explicitly announced their opposition to housing Paul and Hava together in either group home, describing such an arrangement as "unprecedented," "impossible," and "fraught with difficulties." (Am. Compl. ¶¶ 96-97.) A representative of the OPWDD who also attended the meeting, Robert Lopez ("Lopez"), stated that he was not aware of any OPWDD funded persons who were married and resided together in a supervised group home. (Am. Compl. ¶ 99.) Lopez then went on to discuss Paul and Hava's capacity to consent to sexual activity and recommended that sexual consent evaluations be performed for both Paul and Hava. (Am. Compl. ¶¶ 100-01.) Lopez also recommended that Paul and Hava receive sex education related to their capacity to consent to sexual contact. (Am. Compl ¶ 101.) Finally, Lopez stated that a determination of whether Paul and Hava possessed the ability to marry and cohabit should be addressed by IGHL and Maryhaven through Paul and Hava's Individualized Service Plans ("ISPs"). (Am. Compl. ¶ 104.)

Neither IGHL or Maryhaven included sex education, relationship counseling or sexual consent evaluation as a residential or day habilitation goal, service or treatment in either Paul or Hava's ISP. (Am. Compl. ¶ 105.) Although Dr. Barbara Carey-Shaw, IGHL's Clinical Director, offered to perform a sexuality consent evaluation of Paul, she never provided Paul with sex education or any assistance in obtaining such education. (Am. Compl. ¶ 107, 110.) Nor did

-4-

Maryhaven provide any sex education to Hava. (Am. Compl. ¶ 131.) In addition, both the Forzianos and the Samuels were repeatedly advised by IGHL and Maryhaven that they do not provide sex education or relationship counseling as part of their residential habilitation services. (Am. Compl. ¶¶ 111, 133, 135.)

Dr. Carey-Shaw conducted Paul's sexual consent evaluation on May 24, 2011, almost nine months after the August 2010 meeting. (Am. Compl. ¶ 112.) Dr. Carey-Shaw's evaluation found that Paul was not capable of consenting to sexual activity. (Am. Compl. ¶ 114.) Although Maryhaven had performed prior sexual consent evaluations for Hava in 2000 and 2008, the validity of the results were disputed. (Am. Compl. ¶¶ 101, 130.) Maryhaven did not offer to perform an updated sexual consent evaluation for Hava following the August 2010 meeting. (Am. Compl. ¶ 136.) Plaintiffs assert that as a result of the sexual consent evaluation roadblock put in place by Lopez and Defendants, Paul and Hava were "stymied in their efforts to live together as a married couple" after the August 24, 2010 meeting. (Am. Compl. ¶ 143.)

Thereafter, the Forzianos and the Samuels reached out to Lopez in an effort to obtain assistance from the OPWDD with providing Paul and Hava with sex education. (Am. Compl. ¶¶ 145-47.) Although Lopez offered to set up a meeting with IGHL and Maryhaven, he did not provide OPWDD assistance in obtaining sex education or sexual consent evaluations for Paul and Hava. (Am. Compl. ¶ 150.) Nor did Lopez offer assistance in obtaining housing with a different supervised group home that would agree to accommodate Paul and Hava as a married couple. (Am. Compl. ¶ 150.)

Following their telephone conversation with Lopez, the Forzianos and the Samuels contacted legal counsel to consult about Paul and Hava's right to marry and cohabit. (Am.

Compl. ¶ 153.) After some research, Plaintiffs' counsel discovered the Young Adult Institute ("YAI") Sexuality Consent Assessment,[1] which was available to Paul and Hava even though they were not residents of a YAI group home. (Am. Compl. ¶ 153.) The Forzianos and the Samuels became members of the YAI network, applied for YAI's sexuality consent assessment and obtained specialized educational materials published by YAI that helped prepare Paul and Hava for the evaluation. (Am. Compl. ¶ 156.)

YAI Sexuality Consent Assessments were conducted of Paul and Hava on June 14, 2012 and June 21, 2012, respectively. (Am. Compl. ¶ 160.) Both Paul and Hava were found to be able to give verbal informed sexual consent. (Am. Compl. ¶ 161.)

Plaintiffs met with Lopez again regarding Paul and Hava's desire to marry and cohabit on July 30, 2012. (Am. Compl. ¶ 163.) During this meeting, Plaintiffs provided Lopez with the results of Paul and Hava's YAI Sexuality Consent Assessments. (Am. Compl. ¶ 164.) Plaintiffs asked Lopez if there was anything he could do to force IGHL or Maryhaven to accept Paul and Hava as a married couple in their group homes. (Am. Compl. ¶ 166.) Lopez advised Plaintiffs that he had no power to force the Group Home Defendants to permit Paul and Hava to reside together in their homes. (Am. Compl. ¶ 166.) Lopez further advised Plaintiffs that the Group Home Defendants could legally refuse to permit Paul and Hava to cohabit in either home. (Am. Compl. ¶ 167.) Lopez recommended that Plaintiffs either find another group home that would accommodate Paul and Hava's desire to cohabit or consider taking Paul and Hava back into their family homes. (Am. Compl. ¶¶ 168, 171.) Lopez also attempted to dissuade Plaintiffs from

---

[1] The YAI Sexuality Consent Assessment has been approved as a sexuality consent evaluation tool by the OPWDD and is widely used in New York by entities providing residential habilitation services to developmentally disabled adults. (Am. Compl. ¶ 154.)

taking legal action against IGHL and Maryhaven. (Am. Compl. ¶ 170.)

On September 10, 2012, the Forzianos and the Samuels sent letters to both IGHL and Maryhaven, requesting that the they reconsider their opposition to permitting Paul and Hava to cohabit as a married couple in their homes. (Am. Compl. ¶ 176.) The Forzianos and the Samuels included the results of Paul's and Hava's YAI Sexuality Assessments with their letters. (Am. Compl. ¶ 176.)

By letter dated September 24, 2012, IGHL responded that it had "significant concerns" regarding the YAI Sexuality Assessments, as well as with the "practicality of a married couple living in a group home with other non-married peers." (Am. Compl. ¶ 177.) IGHL further responded that its group homes "are not staffed or designed to house and supervise married couples or assist married couples with the dynamics of their relationships." (Am. Compl. ¶ 178.) By letter dated October 1, 2012, Maryhaven responded that it was rejecting the YAI Sexuality Assessment results for Hava and would continue to rely on the previous assessments performed in 2000 and 2008. (Am. Compl. ¶ 181.)

By letter dated October 24, 2012, counsel for Plaintiffs sent demand letters to Lopez at the OPWDD, IGHL and Maryhaven, requesting a reasonable accommodation for Paul and Hava to marry and live together in either IGHL or Maryhaven or in an alternate group home within reasonable geographic proximity to their families. (Am. Compl. ¶ 184.) Counsel for IGHL responded by letter dated December 10, 2012, reiterating that IGHL was not set up to accommodate a married couple. (Am. Compl. ¶ 185.) Neither the OPWDD nor Maryhaven responded to Plaintiffs' demand letters. (Am. Compl. ¶¶ 186-87.)

Plaintiffs commenced the within action on January 22, 2013. Shortly thereafter, Plaintiffs

moved for a preliminary injunction, requesting that the Court order Defendants to allow Paul and Hava to reside together upon their marriage that was scheduled to take place on April 7, 2013. However, on July 1, 2013, Paul and Hava moved out of their respective group homes into a supervised group home that would allow them to cohabit, operated by East End Disability Associates ("East End"), a Suffolk County OPWDD funded program. (Am. Compl. ¶ 65.) Accordingly, by letter dated July 2, 2013, counsel for Plaintiffs advised the Court that Plaintiffs were withdrawing their request for preliminary injunctive relief since East End is now providing the services requested in the motion.

Plaintiffs amended their Complaint on July 17, 2013, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Rehabilitation Act, 29 U.S.C. § 701 et seq., the Fair Housing Act, 42 U.S.C. § 3601 et seq., 42 U.S.C. § 1983 ("Section 1983"), the New York State Executive Law (the "Human Rights Law") and the New York Mental Hygiene Law. Plaintiffs seek money damages, as well as declaratory relief and a permanent injunction. Defendants now move to dismiss Plaintiffs' Amended Complaint in its entirety.

DISCUSSION

I. Legal Standards

A. Federal Rule of Civil Procedure 12(b)(1)

A district court should dismiss a case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) where the court "lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000); see also Fed. R. Civ. P. 12(b)(1). When reviewing a motion to dismiss for lack of jurisdiction, the Court

"must accept as true all material factual allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to Plaintiff[]." Wood v. GMC, No. CV 08-5224, 2010 U.S. Dist. LEXIS 96157, at *9 (E.D.N.Y. Aug. 23, 2010) (quoting J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004)) (additional citation omitted) (alteration in original). The Court may also "consider evidence outside the pleadings, such as affidavits" when determining whether it has jurisdiction. Stoothoff v. Apfel, No. 98 Civ. 5724, 1999 U.S. Dist. LEXIS 10459, at *1 n.1 (S.D.N.Y. July 7, 1999) (citing cases). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." Wood, 2010 U.S. Dist. LEXIS 96157, at *9 (quoting Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005)).

      B.     Federal Rule of Civil Procedure 12(b)(6)

      "To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Facial plausibility" is achieved when the "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556). As a general rule, the court is required to accept as true all of the allegations contained in the complaint. See Iqbal, 129 S. Ct. at 1949; Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007).

      However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements . . . are not entitled to the assumption of truth." Iqbal, 129 S. Ct. at 1949-

50 (citation omitted); see also Twombly, 555 U.S. at 555 (stating that the Court is "not bound to accept as true a legal conclusion couched as a factual allegation"). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations," which state a claim for relief. Iqbal,129 S. Ct. at 1950. A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 555 U.S. at 557). Rather, only a complaint that "states a plausible claim for relief" will survive a motion to dismiss. Iqbal, 129 S. Ct. at 1950.

II.    Plaintiffs' Request for Injunctive Relief

Plaintiffs' Amended Complaint seeks a permanent injunction, enjoining Defendants from refusing to allow Paul and Hava to reside together as a married couple in any supervised group home operated by IGHL, Maryhaven or by any other OPWDD certified supervised group home.[2] According to Plaintiffs, while Paul and Hava are currently receiving all of the services requested through East End Disability Associates, East End does not currently have the capacity to permit Paul and Have to "age in place." (Am. Compl. ¶ 206.) Specifically, Paul and Hava currently reside in an upstairs apartment at East End. (Am. Compl. ¶ 206.) If either develops any impairments over time that restrict their ability to climb stairs, they may be forced to move out of

_____

[2] All Defendants raise arguments with respect to mootness, asserting that Plaintiffs' claims are moot because East End is already providing Paul and Hava with all of the services requested. As Plaintiffs' Amended Complaint notes, due to their placement at East End, there is no longer "any immediate need for a placement for residential habilitation by Paul and Hava" and that "[m]arital and counseling services are provided by East End Disability Associates." (Am. Compl. ¶ 203.) However, there is no request for in the Amended Complaint for immediate injunctive relief. Rather, the Amended Complaint seeks compensatory damages for alleged past discrimination and future injunctive relief. As such, the Court finds that Plaintiffs' claims are not moot.

East End in order to stay together.  (Am. Compl. ¶ 206.)  Thus, Plaintiffs seek a permanent

injunction that would require IGHL, Maryhaven and any other OPWDD certified group home to

provide them with a place to reside together as a married couple at any point in the future.

Plaintiffs' request for future injunctive relief fails as it is not ripe for review.  Nor do

Plaintiffs have standing to seek such relief as there is no real case or controversy before the Court

with respect to this issue.

Constitutional standing requires a plaintiff to present a justiciable case or controversy.

See U.S. Const., art. III, § 2, cl.1; see also Lewis v. Continental Bank Corp., 494 U.S. 472, 477

(1990).  To demonstrate standing, a plaintiff must allege that he has personally suffered: (1) an

injury-in-fact; (2) that is fairly traceable to defendants' alleged misconduct; and (3) is likely to be

redressed by a favorable decision.  See Allen v. Wright, 468 U.S. 735, 751 (1984).  To satisfy

Article III, the injury alleged by plaintiff must be "actual or imminent, not 'conjectural' or

'hypothetical.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (quoting

Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).

Similarly, "[r]ipeness is a doctrine rooted in both Article III's case or controversy

requirement and prudential limitations on the exercise of judicial authority," Murphy v. New

Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005), that is designed to "prevent the

courts, through avoidance of premature adjudication, from entangling themselves in abstract

disagreements."  Id. (quoting Abbott Labs v. Gardner, 387 U.S. 136, 148 (1967)).  "Determining

whether a case [or, as here, an issue] is ripe generally requires [the court] to 'evaluate both the

fitness of the issues for judicial decision and the hardship to the parties of withholding court

consideration.'"  Murphy, 402 F.3d at 347 (quoting Abbott Labs., 387 U.S. at 149).

Here, Plaintiffs request that the Court issue a permanent injunction to prevent alleged harm that Paul and Hava may or may not suffer in the future. This request is based on nothing more than speculation and conjecture that the services currently being provided by East End may at some point become unavailable to Paul and Hava as a result of any number of circumstances that may or may not occur. Such allegations are insufficient to confer standing on the Court. Moreover, with respect to ripeness, for the same reasons that Plaintiffs lack standing to assert this claim, the issue of the availability of future services for Paul and Hava is not currently fit for review. Nor will Paul and Hava suffer any hardship by the Court's decision to decline consideration since they are currently receiving all of the services requested.

Accordingly, Plaintiffs' claims for injunctive relief are dismissed. Since Plaintiffs' second cause of action, brought pursuant to Title III of the ADA seeks only injunctive relief, that claim is dismissed in its entirety.


III.    Eleventh Amendment Immunity

"[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity," Gorton v. Gettel, 554 F.3d 60, 62 (2d Cir. 1009) (quoting Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 236 (2d Cir. 2006)) (additional citation omitted), or there has been "an abrogation of constitutional immunity by Congress." Smith v. N.Y. State Dep't of Taxation and Fin., No. 01 CV 1776, 2002 U.S. Dist. LEXIS 10375, at *8 (E.D.N.Y. May 17, 2002) (citing Welch v. Texas Dep't of Highways and Public Transport., 483 U.S. 468, 472 (1987)). "This bar exists where the relief sought is legal or equitable." Dube v. State Univ. of New York, 900 F.2d 587, 594 (2d Cir. 1990) (quoting

Papasan v. Allain, 478 U.S. 265, 276 (1986)).

The Eleventh Amendment also bars claims for money damages against state officials acting in their official capacities.[3] See Kentucky v. Graham, 473 U.S. 159, 167-68 (1985); see also Qader v. Cohen & Slamowitz, No. 10 cv 1664, 2011 U.S. Dist. LEXIS 2388, at *8 (S.D.N.Y. Jan. 10, 2011) ("A state agency with state officials acting in their official capacities is similarly entitled to immunity."). Both the State of New York and Defendant Courtney Burke, who is sued herein in her official capacity as the Commissioner of the New York State OPWDD (collectively, the "State Defendants"), assert that they are entitled to Eleventh Amendment immunity here.

Plaintiffs and the State Defendants appear to agree that Eleventh Amendment immunity bars Plaintiffs' claims brought against the State Defendants pursuant to the FHA. See Sierotowicz v. State of New York Div. of Housing & Community Renewal, Nos. 04-CV-3886, 04-CV-3887, 04-CV-3888, 2005 U.S. Dist. LEXIS 43028, at *5 (E.D.N.Y. June 14, 2005) (noting that the FHA does not abrogate sovereign immunity) (citing cases); Welch v. Century 21 Chimes Real Estate Inc., No. CV-90-3410, 1991 U.S. Dist. LEXIS 2411, at *3-4 (dismissing plaintiffs' FHA claims against the New York Department of State Licensing Division on the grounds of Eleventh Amendment immunity). Those claims are accordingly dismissed.

With respect to Plaintiffs' Section 1983 claims, "[i]t has long been held that Section 1983 does not allow a State to be called into Federal Court to answer in damages for the alleged deprivation of a federal right." A.A. v. Bd. of Educ., Central Islip Union Free Sch. Dist., 196 F.

---

[3] Since all of Plaintiffs' claims for injunctive relief have already been dismissed, as discussed supra, the remainder of this Memorandum and Order pertains solely to Plaintiffs' claims for money damages.

Supp. 2d 259, 266 (E.D.N.Y. 2002); see also Quern v. Jordan, 440 U.S. 332, 345 (1979) (holding that Congress did not abrogate state sovereign immunity in enacting 42 U.S.C. § 1983). "Absent a valid waiver, such lawsuits are barred by the Eleventh Amendment." A.A., 196 F. Supp. 2d at 266 (citing cases). Accordingly, Plaintiffs' Section 1983 claims against the State Defendants are hereby dismissed.[4]

Relying on Garcia v. State University of New York Health Sciences Center, 280 F.3d 98 (2d Cir. 2001), the Plaintiffs and the State Defendants appear to agree that Eleventh Amendment immunity also bars Plaintiffs' claims brought pursuant to Section 504 of the Rehabilitation Act. Plaintiffs and the State Defendants are incorrect.

In Garcia, the Second Circuit held that when Congress enacts a statute pursuant to the Spending Clause of the United States Constitution, such as the Rehabilitation Act, it may condition a state's acceptance of funds upon a waiver of sovereign immunity. See id. at 113. However, such a waiver will only be found if it is knowing and intentional. See id. at 114.

Garcia went on to hold that New York State's acceptance of Section 504 funds was not a knowing waiver of its sovereign immunity because, at the time the funds were accepted, New York was under the reasonable belief that it had no immunity under the essentially similar provisions of the ADA. See id. at 114-15. Accordingly, when New York accepted Section 504 funds, it could not have believed it was waiving any rights. See id. However, while the Circuit found that New York mistakenly believed its immunity was lost during the time period in

---

[4] The Court notes that even if Eleventh Amendment immunity did not bar Plaintiffs' Section 1983 claims against the State Defendants, those claims would still be subject to dismissal since "[n]either a State nor its officials acting in their official capacities are 'persons' under § 1983." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Accordingly, Plaintiffs' Section 1983 claims against the State Defendants also fail on the merits.

question in that case, it "acknowledged New York's acceptance of federal funds at a later date 'might properly reveal a knowing relinquishment of sovereign immunity.'" <u>Degrafinreid v. Ricks</u>, 417 F. Supp. 2d 403, 414 (S.D.N.Y. 2006) (citing <u>Garcia</u>, 280 F.3d at 113 n.4).

"Since <u>Garcia</u>, state agencies in New York . . . have continued to accept federal funds and, therefore, waived immunity from suit under Section 504 of the Rehabilitation Act." <u>Doe v. Goord</u>, No., 2004 U.S. Dist. LEXIS 24808, at *58 (S.D.N.Y. Dec. 10, 2004) (citing cases). While the district court decisions in this Circuit "disagree as to whether New York effectively waived its sovereign immunity only be accepting federal funds after <u>Garcia</u> was decided, on September 25, 2011, or whether the waiver occurred as early as February 25, 2001, when the [] Supreme Court handed down its decision in <u>Board of Trustees of the University of Alabama v. Garrett</u>, 531 U.S. 356 (2001)," finding that the Eleventh Amendment bars suits brought pursuant to Title I of the ADA, such a finding is irrelevant in this action. <u>Id.</u> at *58-59. The actions complained of by Plaintiffs took place beginning in approximately 2010, at which time New York was clearly subject to suit under Section 504 of the Rehabilitation Act. Accordingly, the State Defendants are not entitled to invoke the protection of the Eleventh Amendment with respect to Plaintiffs' Rehabilitation Act claims.

IV.    <u>The Remaining ADA, Rehabilitation Act and FHA Claims</u>

Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under Section 504 of the Rehabilitation Act,

"no otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "The purpose of both statutes is to 'eliminate discrimination on the basis of disability and to ensure evenhanded treatment between the disabled and the able-bodied.'" Maccharulo v. New York State Dep't of Correctional Servs., No. 08 Civ. 301, 2010 U.S. Dist. LEXIS 73312, at *7 (S.D.N.Y. July 21, 2010) (quoting Doe v. Pfrommer, 148 F.3d 73, 82 (2d Cir. 1998)).

Similarly, the FHA makes it unlawful "to discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). Due to the "similarities" between the FHA, the ADA and the Rehabilitation Act, courts typically "interpret them in tandem." Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 573 n.4 (2d Cir. 2003) (citing Reg'l Econ. Cmty. Action Program v. City of Middletown, 294 F.3d 35, 45-46 (2d Cir. 2002)).

To state a claim under all three statutes, a plaintiff must allege that he or she: (1) is a "qualified individual" with a disability; (2) was "excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity;" and (3) that such exclusion or discrimination was due to his or her disability. Hargrave v. State of Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003) (quoting 42 U.S.C. § 12132). In addition, for purposes of the Rehabilitation Act, a plaintiff must demonstrate that the public entity receives federal funding. See Maccharulo, 2010 U.S. Dist. LEXIS 73312, at *8 (citation omitted). Here, there is no dispute that Paul and Hava fall under the protection of the ADA, the Rehabilitation Act and the FHA. Nor is there any dispute that Defendants are subject to the provisions of those

statutes.

However, while Plaintiffs argue in their Memoranda of Law that Defendants discriminated against them due to their disabilities, the claims alleged in the Amended Complaint all arise out of Defendants' purported refusal to accommodate Paul and Hava's desire to cohabit as a married couple in either IGHL or Maryhaven. Such alleged discrimination is based not on Paul and Hava's disabilities, but rather on their status as a married couple. Plaintiffs' Amended Complaint therefore fails to state a claim for disability discrimination under the ADA, the FHA or the Rehabilitation Act because Plaintiffs have failed to demonstrate that Defendants discriminated against them due to Paul and Hava's disabilities.[5]

Moreover, to establish discrimination under the ADA, the FHA or the Rehabilitation Act, Plaintiffs have three available theories: (1) disparate treatment, or intentional discrimination; (2) disparate impact; and (3) failure to provide a reasonable accommodation. See Tsombanidis, 352 F.3d at 573 (citing City of Middletown, 294 F.3d at 48). The Court notes that while Plaintiffs attempt to argue otherwise in their Memoranda of Law, Plaintiffs' claims "do not draw their substance from any allegedly discriminatory animus against the disabled, either under a disparate treatment or a disparate impact theory." Pfrommer, 148 F.3d at 82. Indeed, "[s]uch an argument

_____

[5] With respect to Plaintiffs' FHA claim, the Amended Complaint also fails due to the fact that Plaintiffs are neither buyers nor renters within the meaning of the FHA. The Court notes that while Maryhaven raises this point in its moving papers, glaringly absent from Plaintiffs' opposition is any argument in response. As noted above, the FHA prohibits discrimination against any disabled "buyer or renter." 42 U.S.C. § 3604(f). Accordingly, the FHA requires that a disabled person "be either a renter or a buyer in order to bring a Fair Housing Act claim." Jenkins v. New York City Dep't of Homeless Servs., 634 F. Supp. 2d 507, 520 (S.D.N.Y. 2009) (dismissing plaintiff's FHA claim regarding placement in a homeless shelter). Since Paul and Hava are not renters or buyers in their respective group homes, but rather receive supervised housing as part of their Medicaid services, they cannot state a claim for relief under the FHA.

-17-

would be beyond tenuous given [Defendants'] sole purpose in assisting the disabled." Id.
Rather, the crux of Plaintiffs' Amended Complaint is that Defendants failed to provide Paul and
Hava with the requested "reasonable accommodation" of allowing them to cohabit in one of their
two group homes upon their marriage. In essence, Plaintiffs are "challenging the adequacy of
[Defendants'] services, not illegal disability discrimination." Id.

The ADA, the FHA and the Rehabilitation Act all require public entities to make
reasonable accommodations for disabled individuals to ensure that they have meaningful access
to public benefits. See Powell v. National Bd. of Medical Examiners, 364 F.3d 79, 85 (2d Cir.
2004) (discussing the Rehabilitation Act's reasonable accommodation requirement); Henrietta D.
v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003) (discussing same under the ADA); Shapiro v.
Cadman Towers, Inc., 51 F.3d 328, 333 (2d Cir. 1995) (discussing same under the FHA). "The
purpose of these requirements is to ensure that services provided to non-disabled individuals are
not denied to disabled individuals because of their disability." Maccharulo, 2010 U.S. Dist.
LEXIS 73312, at *9 (citing Pfrommer, 148 F.3d at 83). Accordingly, where the plaintiff fails to
allege that disabled individuals are being treated differently from non-disabled individuals, he or
she has not stated a claim under the disability statutes. See Maccharulo, 2010 U.S. Dist. LEXIS
73312, at *9 (citing Pfrommer, 148 F.3d at 83); see also Atkins v. County of Orange, 251 F.
Supp. 2d 1225, 1232 (S.D.N.Y. 2003) ("With no allegation of disparate treatment, no claim for
discrimination under the ADA or Rehabilitation Act lies.").

The Second Circuit, as well as district courts within the Circuit, have repeatedly held that
"a claim that challenges the adequacy . . . or the substance . . . of services that are being provided
to a disabled individual is not a valid claim under either the ADA or the Rehabilitation Act."

Maccharulo, 2010 U.S. Dist. LEXIS 73312, at *10 (citing cases). Rather, "the central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied." Pfrommer, 148 F.3d at 83. "Neither the ADA nor the Rehabilitation Act establish an obligation to meet a disabled person's particular needs vis-a-vis the needs of other [disabled] individuals, but mandate only that the services provided by [covered entities] to non-[disabled] individuals not be denied to a disabled person because he is [disabled]." Id. (citing Flight v. Gloeckler, 68 F.3d 61, 63-64 (2d Cir. 1995)) (additional citation omitted).

Here, Plaintiffs seek to have Defendants provide them with particularized services based on their status as a married couple. Accordingly, what Plaintiffs ultimately seek to challenge "is not illegal discrimination against the disabled, but the substance of the services provided to [them] through [Defendants]." Pfrommer, 148 F.3d at 84. Such a cause of action does not lie under the ADA, the FHA or the Rehabilitation Act. See Wright v. Guiliani, 230 F.3d 543, 548 (2d Cir. 2000) ("[T]he disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be. They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not.").

For the foregoing reasons, Plaintiffs' Amended Complaint fails to state a claim under Title II of the ADA, the Rehabilitation Act and the FHA and those claims are accordingly dismissed.

V.    The Section 1983 Claims Against the Group Home Defendants

Plaintiffs' Amended Complaint contains two causes of action pursuant to 42 U.S.C. §

1983 - the first, for violation of the federal Medicaid Statute and the second, for violation of the

Fourteenth Amendment to the United States Constitution.  As the Court has already found that

the State Defendants are entitled to Eleventh Amendment immunity with respect to Plaintiffs'

Section 1983 claims, the following analysis only applies to Defendants IGHL and Maryhaven.

In order to state a claim under Section 1983, a plaintiff must demonstrate that the

defendant was either a state actor, or a private individual or entity who acted "under color of state

law."  Ciambriello v. County of Nassau, 292 F.3d 307, 323 (2d Cir. 2002); Sykes v. James, 13

F.3d 515, 519 (2d Cir. 1993).  This is referred to as the "state action" requirement.  Ciambriello,

292 F.3d at 323.  While it is clear that private entities, such as IGHL and Maryhaven, are not

state actors, such entities can be liable for civil rights violations under Section 1983 if they have

conspired, or engaged in joint activity, with state actors.  See Briscoe v. LaHue, 460 U.S. 325,

330 n.7; Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 271 (2d Cir. 1999).

Plaintiffs here do not allege that either IGHL or Maryhaven is a state entity.  Rather, they

argue that state action exists here under either the "joint action" test, the "public function" test or

the "state compulsion" test.  See Sybalski v. Independent Group Home Living Program, Inc., 546

F.3d 255, 257 (2d Cir. 2008) (articulating three tests formulated by the Supreme Court for

determining the existence of state action).  "It is not enough, however, for a plaintiff to plead

state involvement in '*some activity* of the institution alleged to have inflicted injury upon the

plaintiff'; rather, the plaintiff must allege that the state was involved 'with the *activity that*

*caused the injury*' giving rise to the action."  Id. at 257-58 (quoting United States v. Int'l Bd. of

Teamsters, 941 F.2d 1292, 1296 (2d Cir. 1991)) (emphasis in original).

Under the joint action test, the actions of a private entity will be considered attributable to the state where "the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies." Sybalski, 546 F.3d at 257 (quoting Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 296 (2000)). According to Plaintiffs, the allegations in the Amended Complaint demonstrate that the State showed significant encouragement and support of the Group Home Defendants' decisions not to allow Paul and Hava to reside together once they were married. However, a plain reading of the Amended Complaint demonstrates that while Robert Lopez of the OPWDD attempted to assist Plaintiffs with facilitating Paul and Hava's desire to marry and cohabit, IGHL and Maryhaven would not accommodate such a request. (Am. Compl. ¶¶ 84, 100-01, 104, 148-49, 165-66.) Rather, the Amended Complaint alleges that the State and the Group Home Defendants were actually at odds over how to handle Plaintiffs' request that Paul and Hava be permitted to cohabit. While Plaintiffs now attempt to paint Lopez as facilitating IGHL and Maryhaven's decisions not to allow Paul and Hava to reside together, the Amended Complaint tells quite a different story. Although it is clear that the State was "involved" in the Group Home Defendants' decision to deny Paul and Hava's request to cohabit, that involvement "is insufficient to render that decision 'state action' under the joint action test." Sybalski, 546 F.3d at 259.

To satisfy the state action requirement under the "public function" test, the private entity must "perform a function that is 'traditionally the exclusive prerogative of the state.'" Archer v. Economic Opportunity Comm'n, 30 F. Supp. 2d 600, 606 (E.D.N.Y. 1998) (quoting Rendell-

Baker v. Kohn, 457 U.S. 830, 842 (1982)). Although not clearly asserted, Plaintiffs appear to argue in their Memorandum of Law that the public function test applies because "the state's statutory and regulatory control over the issues of marriage as a civil right, and habilitation services provided to married couples, is so complete as to leave no legitimate discretion with the defendants to act independently of the federal and state laws at issue in this case." (Pl. Mem. of Law 15.) However, the Second Circuit has explicitly rejected such an argument in a similar case involving Defendant IGHL, in which plaintiffs' Section 1983 claims were dismissed for failure to demonstrate state action. See Sybalski, 546 F.3d at 260. Since the Second Circuit held in Sybalski v. Independent Group Home Living Program, Inc., 546 F.3d 255 (2d Cir. 2008), that it could not "conclude that care of the . . . mentally disabled, was a function 'traditionally' and 'exclusively' reserved by the state," id. at 260, Plaintiffs fail to plead circumstances here sufficient to satisfy the public function test.

Finally, under the "state compulsion" test, a finding of state action requires that the private entity "acts pursuant to the 'coercive power' of the state or is 'controlled' by the state." Id. at 58 (quoting Brentwood Acad., 531 U.S. at 296). The Court finds that Plaintiffs have failed to satisfy this test because there is no indication from the Amended Complaint that there existed any coercion or encouragement by the state in the complained of conduct. To the contrary, although ultimately unsuccessful, Lopez of the OPWDD attempted to assist Plaintiffs in reaching a resolution of some type with the Group Home Defendants. Moreover, the Amended Complaint makes clear that Lopez specifically told Plaintiffs that "he had no power to force IGHL or Maryhaven to permit Paul and Hava to live together in their homes." (Am. Compl. ¶ 166.) While Plaintiffs argue that "federal and state laws at issue in this case compel [IGHL and

-22-

Maryhaven] to assist residents with marriage goals," therefore making them "subject to the Medicaid comparability statute to the same degree as the state would be if it provided services directly," (Pl. Mem. of Law 16-17), the "compulsion" alleged by Plaintiffs does not satisfy the state compulsion test. As stated above, state involvement in "some activity" of the private entity alleged to have injured plaintiff is not enough to demonstrate state action. Sybaslki, 546 F.3d at 257. "[R]ather, the plaintiff must allege that the state was involved 'with the activity that caused the injury' giving rise to the action." Id. at 258 (quoting Schlein, 561 F.2d at 428). This, Plaintiffs have failed to do.

Accordingly, since Plaintiffs have failed to demonstrate state action on the part of either IGHL or Maryhaven, they have failed to state a viable claim under Section 1983 and those claims are accordingly dismissed.


VI.    Plaintiffs' State Law Claims

Having found that Plaintiffs' federal claims fail as a matter of law, there is no longer any independent basis for federal jurisdiction in the within action. Although the Court has the discretion to exercise supplemental jurisdiction over plaintiff's remaining state law claims, see 28 U.S.C. § 1367(a), it declines to do so. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well.").

Accordingly, Plaintiffs' state law claims are dismissed without prejudice.[6]

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted and the Plaintiffs' Amended Complaint is dismissed in its entirety. The Clerk of the Court is directed to terminate docket entry numbers 78, 80 and 84 and to mark this case closed.

**SO ORDERED:**

Dated: March 26, 2014
Central Islip, New York

s/ Leonard D. Wexler

LEONARD D. WEXLER
United States District Judge

---

[6] " Since [New York's CPLR § 205] allow[s] a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations,' plaintiffs will not be prejudiced by the dismissal of their [state law] claims." Tishman v. The Associated Press, No. 05 Civ. 4278, 2007 U.S. Dist. LEXIS 85588, at *29 (S.D.N.Y. Nov. 19, 2007) (quoting Trinidad v. N.Y City Dep't of Corr., 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006)) (alterations in original) (additional citations omitted).